PETER J. VOLLEMANS, JR. *v.* TOWN OF
WALLINGFORD
(AC 27332)

Schaller, McLachlan and Gruendel, Js.

Argued January 12—officially released August 14, 2007

*John-Henry M. Steele,* for alleged the appellant (plaintiff).

*Michael J. Rose,* with whom was *Johanna G. Zelman,* for the appellee (defendant).

### Opinion

GRUENDEL, J. In *Delaware State College* v. *Ricks,* 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980), the United States Supreme Court held that the period for filing a discriminatory discharge complaint accrues when the employer unequivocally notifies the employee of termination. We are asked in this case to adopt that federal precedent as a matter of state law. We decline

to do so in light of the remedial purpose of the Connecticut Fair Employment Practices Act, the legislative history surrounding General Statutes § 46a-82 (e) and the compelling policy considerations that favor a contrary rule. Accordingly, we reverse the judgment of the trial court granting summary judgment in favor of the defendant, the town of Wallingford, on the age discrimination action of the plaintiff, Peter J. Vollemans, Jr.

The following facts are undisputed. The plaintiff became superintendent of the Pierce power plant, which the defendant owned and operated, in 1989. On February 25, 2000, the plaintiff was informed that the plant would be closed and his position eliminated. The defendant closed the plant on June 30, 2000, but retained the plaintiff's services for some time thereafter as it decommissioned the plant. On November 13, 2002, the defendant's personnel director received a letter from the plaintiff's attorney. That letter provided in relevant part: "I have been retained by [the plaintiff] to represent him in connection with his current employment situation with the [defendant]. . . . As you probably know, [the plaintiff's] employment is scheduled to terminate effective on or about December 31, 2002 . . . . All of the other employees at the power plant, who are not being terminated, are substantially younger than [the plaintiff] . . . . The absence of any other reason substantiating the disparate treatment between [the plaintiff] and the other power plant employees raises a strong presumption that [the plaintiff] is not being transferred to another position simply because of his age. During his employment, certain representations were made to [the plaintiff] . . . that [the plaintiff] would have a position with the [defendant] as long as he wanted. . . . Accordingly, the failure to continue [the plaintiff's] employment with the [defendant] appears to be in direct contradiction of these promissory representations . . . . [The plaintiff] is prepared

to bring his claims to the [commission on human rights and opportunities (commission)] and to court if necessary, but would rather attempt to reach an accord with the [defendant] than proceed in this matter. Therefore, [the plaintiff] respectfully requests that a representative of the [defendant] contact me . . . to discuss a possible resolution of these issues short of litigation."

The plaintiff subsequently was provided written notice of the impending termination of his employment. In a letter to the plaintiff dated December 13, 2002, Raymond F. Smith, the defendant's director of public utilities, informed him that "[t]his letter will serve as final notice of your termination with the [defendant] . . . ." The plaintiff's final day of employment was January 21, 2003.

The plaintiff filed a complaint with the commission on June 3, 2003, which alleged that his employment was terminated "because of his age in violation of the prohibitions in the Connecticut Fair Employment Practices Act [(CFEPA), General Statutes § 46a-51 et seq.]." After conducting a merit assessment review, the commission dismissed the plaintiff's action as untimely under § 46a-82 (e). The commission stated: "The complaint is untimely filed. There is documentation in the form of a letter written by the [plaintiff's] attorney dated November 13, 2002 which indicates that the [plaintiff] was aware that he was scheduled to be terminated as of December 31, 2002. In that the complaint was not filed until June 3, 2003, more than 180 days had elapsed from the date the [plaintiff] had first knowledge of his impending termination. Termination is not a continuing violation." The commission further issued a release of jurisdiction, authorizing the plaintiff to commence a civil action in the Superior Court.

The plaintiff's December 17, 2003 complaint followed, which repeated his allegation before the commission

that the termination of his employment constituted age discrimination in violation of CFEPA.[1] Following discovery, the defendant moved for summary judgment on three grounds: (1) that the plaintiff's complaint to the commission was untimely; (2) that the plaintiff failed to establish a prima facie case of age discrimination; and (3) that the defendant had articulated a nondiscriminatory reason for the termination of the plaintiff's employment. The court heard argument on the motion on May 31, 2005. In its memorandum of decision, the court applied the rule set forth in *Ricks*, holding that "the alleged discriminatory act for the purposes of the timeliness of the plaintiff's appeal to the [commission] in the present case is the date on which the plaintiff received a definite notice of his termination." Finding that the plaintiff had received that notice "sometime before November 13, 2002," the court concluded that no genuine issues of material fact existed regarding the defendant's claim that the plaintiff's complaint to the commission was untimely. It therefore rendered summary judgment in favor of the defendant.[2] From that judgment, the plaintiff now appeals.

Our standard of review governing a court's grant of summary judgment is well established. Summary judgment is appropriate when "the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 744–45, 660 A.2d 810 (1995); Practice Book § 17-49. As the court's decision on a motion for summary judgment is a legal determination,

---

[1] The plaintiff also instituted a separate action against the defendant sounding in breach of contract on March 12, 2003, stemming from the termination of his employment. The court consolidated the plaintiff's two actions on March 15, 2004. That breach of contract action is not at issue in this appeal.

[2] The court did not address the defendant's alternate grounds for summary judgment.

our review on appeal is plenary. *Rosato* v. *Mascardo*, 82 Conn. App. 396, 410, 844 A.2d 893 (2004).

"Because litigants ordinarily have a constitutional right to have issues of fact decided by the finder of fact, the party moving for summary judgment is held to a strict standard. [The moving party] must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . A material fact is a fact that will make a difference in the result of the case. . . . [T]he burden of showing the nonexistence of any material fact is on the party seeking summary judgment . . . . It is not enough for the moving party merely to assert the absence of any disputed factual issue; the moving party is required to bring forward . . . evidentiary facts, or substantial evidence outside the pleadings to show the absence of any material dispute. . . . The party opposing summary judgment must present a factual predicate for his argument to raise a genuine issue of fact. . . . Once raised, if it is not conclusively refuted by the moving party, a genuine issue of fact exists, and summary judgment is inappropriate.

"The court is required to view the facts presented in a motion for summary judgment in the light most favorable to the party opposing the motion. . . . [I]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Citations omitted; internal quotation marks omitted.) *Barasso* v. *Rear Still Hill Road, LLC*, 81 Conn. App. 798, 802–803, 842 A.2d 1134 (2004). Finally, because this case distills to an issue of statutory interpretation, our review of that issue of law is plenary.

See *Dark-Eyes* v. *Commissioner of Revenue Services*, 276 Conn. 559, 570, 887 A.2d 848, cert. denied, 549 U.S. 815, 127 S. Ct. 347, 166 L. Ed. 2d 26 (2006).

The plaintiff brought the present action under CFEPA, which proscribes discriminatory employment practices on, inter alia, the basis of age. See General Statutes § 46a-60 (a) (1).[3] That statutory scheme sets forth the procedure for filing a complaint thereunder. Section 46a-82 (e) requires that "[a]ny complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination except that any complaint by a person claiming to be aggrieved by a violation of subsection (a) of section 46a-80 must be filed within thirty days of the alleged act of discrimination." This appeal centers on the plaintiff's compliance with that statute.

Our Supreme Court scrutinized § 46a-82 (e) in *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 777 A.2d 645, aff'd after remand, 67 Conn. App. 316, 786 A.2d 1283 (2001), and concluded that the time limit contained therein is not subject matter jurisdictional; id., 282; but rather operates as a statute of limitations. Id., 278. The court explained: "[T]he failure to meet the 180 day time limit in § 46a-82 (e) is [not] without consequence. . . . [I]f a time requirement is deemed to be mandatory, it must be complied with, absent such factors as consent, waiver or equitable tolling. Thus, a complaint that is not filed within the mandatory time requirement is dismissible unless waiver, consent, or some other compelling equitable tolling doctrine applies. We conclude that the time limit of § 46a-82 (e) is mandatory, and thus the commission

---

[3] Entitled "Discriminatory employment practices prohibited," General Statutes § 46a-60 provides in relevant part: "(a) It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to . . . discharge from employment any individual . . . because of the individual's . . . age . . . ."

*could* properly dismiss the plaintiff's complaint if it was not filed within 180 days of the alleged act of discrimination." (Emphasis in original.) Id., 284.

The plaintiff does not argue that waiver, consent or some other compelling equitable tolling doctrine applies in the present case. Although his claim is simple, its resolution is not. The plaintiff contends that he filed his complaint with the commission within 180 days of the act of discrimination, which he claims occurred on his final day of employment.[4] By contrast, the defendant maintains that the alleged act of discrimination occurred when the plaintiff was notified of the termination of his employment at some point prior to the November 13, 2002 letter from the plaintiff's attorney seeking to negotiate the plaintiff's employment status.

The pertinent issue, then, concerns the proper interpretation of § 46a-82 (e). Our task is to determine, in an age discrimination action in which the allegedly discriminatory practice is the termination of employment, precisely when the alleged act of discrimination transpires.[5] That is a question of first impression in Connecticut. Although our inquiry begins with the mandate of General Statutes § 1-2z,[6] the respective arguments of

[4] In the event that this court were to adopt the federal rule enunciated in *Ricks*, the plaintiff alternatively argues that he filed his complaint within 180 days of December 13, 2002, the date that he claims to have received unequivocal notice of the termination of his employment.

[5] We reject the defendant's exhortation to defer to the commission's interpretation of General Statutes § 46a-82 (e). "[While] [o]rdinarily, [an appellate] court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes . . . when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." (Internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Dept. of Public Utility Control*, 274 Conn. 119, 127, 874 A.2d 776 (2005).

[6] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and

the parties underscore the patent ambiguity in § 46a-82 (e). Under that statute, the operative date is that on which "the alleged act of discrimination" occurred. In discriminatory termination of employment cases like the present one, the act alleged is the plaintiff's discharge. Yet § 46a-60 (a) (1) does not indicate when "discharge from employment" arises. We therefore consider extratextual evidence to ascertain its proper meaning.

"According to our long-standing principles of statutory construction, our fundamental objective is to ascertain and give effect to the intent of the legislature. . . . In determining the intent of a statute, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *King* v. *Sultar*, 253 Conn. 429, 437–38, 754 A.2d 782 (2000). "In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *King* v. *Board of Education*, 203 Conn. 324, 332–33, 524 A.2d 1131 (1987). In addition, "[w]here the meaning of a statute is in doubt, reference to legislation in other states and jurisdictions which pertains to the same subject matter, persons, things, or relations may be a helpful source of interpretative guidance." (Internal quotation marks omitted.) *Johnson* v. *Manson*, 196 Conn. 309, 318–19, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986).

does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

I

As our Supreme Court has observed, CFEPA "defines important rights designed to rid the workplace of discrimination . . . ."[7] *Sullivan* v. *Board of Police Commissioners*, 196 Conn. 208, 216, 491 A.2d 1096 (1985); see also *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 694, 855 A.2d 212 (2004). "As such, the act is composed of remedial statutes, which are to 'be construed liberally to effectuate their beneficent purposes.' *Civil Service Commission* v. *Trainor*, 39 Conn. Sup. 528, 532, 466 A.2d 1203 (1983); see also *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995) (remedial statutes are to 'be liberally construed in favor of those whom the legislature intended to benefit')." *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 355, 680 A.2d 1261 (1996). Therefore, a broad reading of the filing period contained in § 46a-82 (e) is required.

The legislative history surrounding § 46a-82 (e) comports with that principle. The statute was amended in 1974 by No. 74-54 of the 1974 Public Acts, which changed the filing deadline from ninety to 180 days. As the trial court noted in its memorandum of decision, one purpose of that amendment was "to bring state law into accord with federal law."[8] *Williams* v. *Commission*

[7] "[T]he noble purpose of this bill . . . is to create an effective machinery in this state for the elimination of discrimination in employment." 8 H.R. Proc., Pt. 12, 1959 Sess., p. 2584, remarks of Representative Robert Satter.

[8] Prior to the 1974 amendment, the filing period contained in General Statutes § 46a-82 (e) was much shorter than that of its federal counterpart. Conn. Joint Standing Committee Hearings, Human Rights and Opportunities, 1974 Sess., p. 4. Similarly, the General Assembly in 1975 again amended § 46a-82 to expand the amount of time for which back pay could be awarded as a remedy for an unfair employment practice to two years, so as to bring our statute into harmony with federal law. *Williams* v. *Commission on Human Rights & Opportunities*, supra, 257 Conn. 274–75 (citing Public Acts 1975, No. 75-27).

Application of that legislative purpose to the particular issue now before this court is somewhat dubious in light of the fact that § 46a-82 (e) was

*on Human Rights & Opportunities*, supra, 257 Conn. 274. Equally significant, the revision aimed to ensure that potentially meritorious claims were not dismissed due to late filing. As Arthur L. Green, director of the commission, testified: "[P]erhaps the reason for the bill is that many citizens not knowing of the commission get around to filing the complaint much past the [ninety] day period. We think there is so allowed discrimination in this state and people will have a chance to get to us without being cut off. In the last two weeks we had to turn away [three] cases that came to our [attention, perfectly] valid complaints . . . because the [ninety] days had [passed]." Conn. Joint Standing Committee Hearings, Human Rights and Opportunities, 1974 Sess., p. 4; see also *Williams* v. *Commission on Human Rights & Opportunities*, supra, 274 (legislature amended filing requirement in response to prevalence of complainants missing filing deadline). That history provides strong evidence that the legislature sought to avoid the dismissal of complaints under § 46a-82 (e) due to late filing.

Finally, we note that "Connecticut law repeatedly has expressed a policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his or her day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure." (Citations omitted; internal quotation marks omitted.) *Egri* v. *Foisie*, 83 Conn. App. 243, 249–50, 848 A.2d 1266, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004). That preference represents "a fundamental policy consideration in this state."[9] Id., 249. With

amended years *before* the Supreme Court's enunciation of the rule in *Ricks* and *Chardon* v. *Fernandez*, 454 U.S. 6, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981). See part II. Prior to those decisions, federal law generally held to the contrary. See footnote 13.

[9] As our Supreme Court explained, "[c]enturies ago the common law courts of England . . . insisted upon rigid adherence to the prescribed

those principles in mind, we turn to the federal precedent we are asked to adopt, as well as the policy considerations involved therein.

## II

The defendant maintains that the United States Supreme Court dispositively resolved the present dispute and urges us to adopt, as a matter of state law, that federal interpretation of the 180 day filing requirement. "In defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e et seq.], the federal statutory counterpart to § 46a-60." *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 164, 717 A.2d 1254 (1998); see also *Williams* v. *Commission on Human Rights & Opportunities*, supra, 257 Conn. 278. At the same time, while often a source of " 'great assistance and persuasive force' "; *Local 1186 of Council No. 4* v. *State Board of Labor Relations*, 224 Conn. 666, 671, 620 A.2d 766 (1993); it is axiomatic that decisions of the United States Supreme Court are not binding on Connecticut courts tasked with interpreting our General Statutes. Rather, "Connecticut is the final arbiter

forms of action, resulting in the defeat of many suits for technical faults rather than upon their merits. Some of that ancient jurisprudence migrated to this country . . . and has affected the development of procedural law in this state. . . . [H]owever, our legislature enacted numerous procedural reforms applicable to ordinary civil actions that are designed to ameliorate the consequences of many deviations from the prescribed norm [that] result largely from the fallibility of the legal profession, in order generally to provide errant parties with an opportunity for cases to be resolved on their merits rather than dismissed for some technical flaw." (Internal quotation marks omitted.) *Coppola* v. *Coppola*, 243 Conn. 657, 664–65, 707 A.2d 281 (1998), quoting *Andrew Ansaldi Co.* v. *Planning & Zoning Commission*, 207 Conn. 67, 75–76, 540 A.2d 59 (1988) (*Shea, J.,* concurring); see also *Concept Associates, Ltd.* v. *Board of Tax Review*, 229 Conn. 618, 623–24, 642 A.2d 1186 (1994) ("[o]ver-technical formal requirements have ever been a problem of the common law, leading [the legislature] at periodic intervals to enact statutes . . . which, in substance, told the courts to be reasonable in their search for technical perfection" [internal quotation marks omitted]).

of its own laws."[10] *Johnson* v. *Manson*, supra, 196 Conn. 319.

In the seminal case of *Delaware State College* v. *Ricks*, supra, 449 U.S. 250, the United States Supreme Court addressed the filing requirement of Title VII, which, like § 46a-82 (e), "requires aggrieved persons to file a complaint with the [Equal Employment Opportunity Commission (EEOC)] 'within one hundred and eighty days after the alleged unlawful employment practice occurred.' 42 U.S.C. § 2000e-5 (e)." *Delaware State College* v. *Ricks*, supra, 256. The plaintiff was a member of the faculty at Delaware State College. On March 13, 1974, the college's board of trustees (board) voted to withhold tenure from the plaintiff. Id., 252. A grievance proceeding initiated by the plaintiff followed. On June 26, 1974, the board sent the plaintiff an official notice of its decision, in which it informed him "of its intent not to renew [his] contract at the end of the 1974-75 school year." Id., 253 n.2. Although that notice acknowledged that the result of the pending grievance proceeding could overturn the board's decision, the grievance was denied on September 12, 1974. Id., 254.

---

[10] We disagree that the rule established by *Ricks* and *Chardon* v. *Fernandez*, 454 U.S. 6, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981), which we will discuss, is deserving of great deference simply because it emanated from the United States Supreme Court, particularly when other states have proclaimed it unsound. See, e.g., *Romano* v. *Rockwell International, Inc.*, 14 Cal. 4th 479, 498, 926 P.2d 1114, 59 Cal. Rptr. 2d 20 (1996) ("we question the soundness of the reasoning of the high court's decisions in *Ricks* and *Chardon*"); *Homlin* v. *TRW, Inc.*, 330 N.J. Super. 30, 46, 748 A.2d 1141 (App. Div. 2000) ("[w]e see no reason to adopt the arbitrary rule of *Ricks* and *Chardon* [which lack] any persuasive discussion of a sound policy basis"), aff'd, 167 N.J. 205, 770 A.2d 283 (2001).

In interpreting our statutes and deciding this question of first impression as a matter of Connecticut law, we are free to depart from that federal statutory interpretation upon concluding that it fails to effectuate both the legislative policy underlying the statute at issue and the remedial nature thereof, as have more than one-third of those sibling jurisdictions that considered the question. See part II.

On April 28, 1975, the plaintiff filed with the EEOC an employment discrimination complaint against the college. The EEOC subsequently issued a right to sue letter. Id. The plaintiff then commenced an action in federal court, alleging that in denying him tenure, the college discriminated against him on the basis of his national origin in violation of Title VII and 42 U.S.C. § 1981.[11] *Delaware State College* v. *Ricks,* supra, 449 U.S. 254. The District Court dismissed both claims as untimely, holding that the alleged discriminatory event occurred on June 26, 1974, when the plaintiff received official notice of the denial of tenure. Id., 254–55. His April 28, 1975 complaint to the EEOC, therefore, fell well beyond the 180 day period required by 42 U.S.C. § 2000e-5 (e). *Delaware State College* v. *Ricks,* supra, 254–55.

On appeal, the United States Court of Appeals for the Third Circuit reversed that judgment. See *Ricks* v. *Delaware State College,* 605 F.2d 710 (3d Cir. 1979), rev'd, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980). The court posed the question before it as, "[f]rom what date does this 180-day period run?" Id., 711. The court began its analysis with a discussion of *Bonham* v. *Dresser Industries, Inc.,* 569 F.2d 187 (3d Cir. 1977), cert. denied, 439 U.S. 821, 99 S. Ct. 87, 58 L. Ed. 2d 113 (1978), in which it considered a similar question regarding the 180 day filing requirement contained in the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. Quoting that decision, the Third Circuit stated: "The 180-day period does not begin to run until the employee knows, or as a reasonable person should know, that the employer has made a final decision to terminate him, *and the employee ceases to render further services to the employer.* Until that time he

---

[11] Unlike the complaint in the present case, the complaint in *Ricks* did not allege a discriminatory discharge. *Delaware State College* v. *Ricks,* supra, 449 U.S. 257.

may have reason to believe that his status as an employee has not finally been determined, and should be given an opportunity to resolve any difficulty while he continues to work for the employer. In any event, a terminated employee who is still working should not be required to consult a lawyer or file charges of discrimination against his employer as long as he is still working, even though he has been told of the employer's present intention to terminate him in the future." (Emphasis in original; internal quotation marks omitted.) *Ricks* v. *Delaware State College*, supra, 712. In light of the identical wording of the respective 180 day filing requirements in Title VII and the ADEA, the court perceived "no reason to interpret the two requirements differently . . . ." Id.

Among the considerations noted by the Third Circuit were the fact that employers may reverse termination decisions and that forcing a plaintiff to file suit while still employed by the defendant would engender hostility in the workplace. Id. The court further stated that a rule focusing on the last day of employment would provide a bright line guide to courts and employees alike in what is often a clouded matter.[12] Id., 712–13. Applying that rule, the court held that the alleged discriminatory event occurred on June 30, 1975, the plaintiff's last day of employment. Id., 713. Accordingly, his EEOC complaint was timely.

---

[12] As the Third Circuit stated: "Under the appellees' formulation, courts would have to determine when purportedly final decisions are really final and when a reasonable person would really know or have reason to know that a final decision had been made. Besides creating complexity and thereby increasing the cost of litigation, this approach is likely to become a trap for employees who, through attempts at internal resolution of their grievances, would unwittingly lose the opportunity to make a timely filing of their charge. Such an approach would ignore the learning of *Love* v. *Pullman*, 404 U.S. 522, [527] 92 S. Ct. 616, 30 L. Ed. 2d 679 (1972), that courts, in construing the procedural requirements of Title VII, must be mindful that it is often laymen, not lawyers, who initiate the process." *Ricks* v. *Delaware State College*, supra, 605 F.2d 713.

The United States Supreme Court reversed the judgment of the Third Circuit. It first observed that "limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College* v. *Ricks*, supra, 449 U.S. 256–57. The court then explained that the determination of whether the plaintiff's complaint was filed in a timely manner required a precise identification of the unlawful employment practice of which the plaintiff complained. Id., 257. Noting that termination of employment is "a delayed, but inevitable, consequence of the denial of tenure," the court concluded that "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to [the plaintiff]." Id., 257–58. It continued: "[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." (Emphasis in original; internal quotation marks omitted.) Id., 258. Because the board "formally rejected" the plaintiff's tenure bid and communicated that " 'official position' " to the plaintiff on June 26, 1974, the court held that the 180 day filing period commenced on that date. Id., 261. His action, therefore, was time barred.

Four justices dissented from the *Ricks* majority opinion. In a dissent joined by Justices Brennan and Marshall, Justice Stewart indicated that "a fair reading of the complaint reveals a plausible allegation that the [c]ollege actually denied [the plaintiff] tenure on September 12, 1974, the date on which the [b]oard finally confirmed its decision to accept the faculty's recommendation that he not be given tenure." Id., 263 (Stewart, J., dissenting). Underscoring the difficulty in determining precisely when definitive communication

of termination is made, he observed that "the [b]oard itself may have regarded its earlier actions as tentative or preliminary, pending a thorough review triggered by the respondent's request to the [board's educational policy] [c]ommittee. . . . [The plaintiff] may be able to prove to the District Court that at his [c]ollege the original [b]oard response to the faculty's recommendation was not a virtually final action subject to reopening only in the most extreme cases, but a preliminary decision to advance the tenure question to the [b]oard's grievance committee as the next conventional stage in the process." Id., 264 (Stewart, J., dissenting).

Justice Stevens dissented separately. In addressing the issue at hand, he explained that "[t]hree different reference points could arguably determine when a cause of action for a discriminatory discharge accrues: (1) when the employer decides to terminate the relationship; (2) when notice of termination is given to the employee; and (3) when the discharge becomes effective." Id., 265 (Stevens, J., dissenting). Justice Stevens agreed with the Third Circuit that the filing period should commence on the last day of a complainant's employment. He stated: "The most sensible rule would provide that the date of discharge establishes the time when a cause of action accrues and the statute of limitations begins to run. Prior to that date, the allegedly wrongful act is subject to change; more importantly, the effective discharge date is the date which can normally be identified with the least difficulty or dispute." Id. (Stevens, J., dissenting).

Less than one year after deciding *Ricks*, the United States Supreme Court revisited the issue in *Chardon* v. *Fernandez*, 454 U.S. 6, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981), which, like *Ricks*, involved nontenured educators. Prior to June 18, 1977, the *Chardon* plaintiffs were informed that their appointments would expire at the "termination of the present school year" and were given

termination dates between June 30 and August 8, 1977. *Rivera Fernandez* v. *Chardon*, 648 F.2d 765, 766 (1st Cir.), rev'd, 454 U.S. 6, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981). On June 19, 1978, the plaintiffs filed suit under 42 U.S.C. § 1983, alleging unlawful termination of employment. *Rivera Fernandez* v. *Chardon*, supra, 766. The applicable statute of limitations prescribed a one year limit. Id., 766–67. Hence, each complaint was timely if measured from the actual termination of employment but late if measured from when the plaintiffs were informed of that termination. Id. The United States Court of Appeals for the First Circuit concluded that the plaintiffs' complaints were timely. Id., 767.

In a per curiam opinion, the Supreme Court concluded otherwise. It stated: "The decision below is contrary to [our] recent decision [in] *Delaware State College* v. *Ricks* [supra, 449 U.S. 250]. . . . The Court of Appeals for the First Circuit distinguished *Ricks* on the ground that [the plaintiff in *Ricks*] had alleged that denial of tenure was the 'unlawful employment practice,' whereas here [the] respondents allege that termination of their employment as administrators was the 'unlawful employment practice.' We think *Ricks* is indistinguishable. When [the plaintiff in *Ricks*] was denied tenure, he was given a 1-year 'terminal' contract. Thus, in each case, the operative decision was made—and notice given—in advance of a designated date on which employment terminated." *Chardon* v. *Fernandez*, supra, 454 U.S. 7–8. Because the plaintiffs were notified "that a final decision had been made to terminate their appointments" more than one year before they filed their complaints, the court held that the complaints were time barred. Id., 8.

As in *Ricks*, the *Chardon* opinion was not unanimous. Justice Brennan, joined by Justice Marshall, dissented, stating that the case was "plainly distinguishable from *Ricks* . . . ." Id., 9 (Brennan, J., dissenting). He

explained: "It is one thing to hold, as was held in [*Ricks*], that for the purpose of computing the limitations period, a cause of action for denial of a benefit such as tenure, and consequent damage, accrues when the plaintiff learns that he has been denied that benefit; it is quite another to hold, as the [c]ourt does here, that a cause of action for damages resulting from an unconstitutional termination of employment accrues when the plaintiff learns that he will be terminated. To my knowledge, such a rule has no analogue in customary principles of limitations law. See 4 A. Corbin, Contracts § 989 (1951) ('The plaintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation; and he would be so penalized if the statutory period of limitation is held to begin to run against him immediately')." *Chardon* v. *Fernandez*, supra, 454 U.S. 9 (Brennan, J., dissenting). Justice Brennan concluded that "[t]he effect of this ruling will be to increase the number of unripe and anticipatory lawsuits in the federal courts—lawsuits that should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy." Id. (Brennan, J., dissenting).

As he did in *Ricks*, Justice Stevens authored a separate dissent, this time joined by Justices Brennan and Marshall. Quoting from the decision of the First Circuit, he stated: "The issue of when the cause of action accrues depends . . . on when the alleged unlawful act occurred. It is necessary, therefore, to identify the unlawful act. Where, as here, the claim is that an employment decision was made for a prohibited reason, it could be argued that the unlawful act was the making of the decision, rather than the implementation of it. But we think such a refined rule would depart too sharply from the understanding of ordinary people.

. . . The alleged unlawful act was revocable, incomplete and, for practical purposes, nonexistent until the actual demotion or discharge. . . . [W]here, as here, the date that is most closely related to the plaintiffs' claim is also the date most easily identified, we think concern for adoption of the rule that best promotes certainty and eliminates litigation over technical niceties is well warranted. . . . [The] plaintiffs' quarrel is with their demotions and discharges—not with the notices themselves. No actual harm is done until the threatened action is consummated. Until then, the act which is the central focus of the plaintiffs' claim remains incomplete." (Citation omitted; internal quotation marks omitted.) Id., 10–13 (Stevens, J., dissenting). Justice Stevens thus concluded that the plaintiffs' complaints should not have been dismissed as untimely. Id., 13 (Stevens, J., dissenting).

Prior to the enunciation of the so-called *Ricks-Chardon* rule, several federal courts, in addition to the respective decisions of the Third Circuit and First Circuit in *Ricks* and *Chardon*, rejected such a rule.[13] In the

[13] For example, in *Bonham* v. *Dresser Industries, Inc.*, supra, 569 F.2d 191, the Third Circuit concluded that for the statute of limitations to run, two prerequisites must be met: (1) the employee must receive unequivocal notice of termination and (2) the employee must have worked his last day. Applying that test, the court concluded that "the alleged unlawful practice occurred on October 31, 1975 when [the plaintiff] ceased to perform services for [the defendant] with knowledge and on notice that he was not to return to his job." Id., 192. The United States Court of Appeals for the Second Circuit reached a similar result in the related cases of *Noble* v. *University of Rochester*, 535 F.2d 756, 758 (2d Cir. 1976), and *Egelston* v. *State University College at Geneseo*, 535 F.2d 752, 755 (2d Cir. 1976). In *Rubin* v. *O'Koren*, 621 F.2d 114 (5th Cir. 1980), the United States Court of Appeals for the Fifth Circuit held that "[a] cause of action accrues under [42 U.S.C.] § 1983 when the plaintiff knows or has reason to know of the injury which is the basis of the action. . . . For the cause of action to accrue, a plaintiff must first have suffered an injury supporting the maintenance of a suit to enforce his claim. . . . Until her last day of employment, [the plaintiff] could not be certain that she would suffer any recompensable injury. . . . When her employment period terminated and she ceased to perform paid services for the [defendant] [u]niversity, [the plaintiff's] injury was complete and her

wake of *Ricks* and *Chardon*, federal courts necessarily have applied those holdings in disputes involving filing limitations in ADEA or Title VII cases.[14] Because those lower federal courts are bound by the precedent of the United States Supreme Court in deciding federal claims, they shed little additional light on the issue before us. One federal decision that merits attention, however, is *Janikowski* v. *Bendix Corp.*, 823 F.2d 945 (6th Cir. 1987).

Like the present case, *Janikowski* involved a question of whether the filing limitation commenced on the final day of employment or the date of notice of

cause of action accrued." (Citations omitted; internal quotation marks omitted.) Id., 116.

Likewise, in *Krzyzewski* v. *Metropolitan Government of Nashville & Davidson County*, 584 F.2d 802 (6th Cir. 1978), the United States Court of Appeals for the Sixth Circuit explained that the ADEA "is humanitarian legislation which must be interpreted in a humane and commonsensical manner; its 180-day filing period is very short. An employee should not be required to take action to enforce his rights while he continues to work and while his employment status is at all uncertain. The 180-day period does not begin to run until the employee knows, or as a reasonable person should know that the employer has made a final decision to terminate him, *and the employee ceases to render further services to the employer*. Until that time he may have reason to believe that his status as an employee has not finally been determined, and should be given an opportunity to resolve any difficulty while he continues to work for the employer. In any event, a terminated employee who is still working should not be required to consult a lawyer or file charges of discrimination against his employer as long as he is still working, even though he has been told of the employer's present intention to terminate him in the future." (Emphasis added.) Id., 805–806; see also *Moses* v. *Falstaff Brewing Corp.*, 525 F.2d 92, 95 (8th Cir. 1975) (plaintiff fully complied with ADEA notice requirement because "although notice of discharge was transmitted on November 12, 1973, it was not fully implemented until the appellant's official termination on November 30, 1973").

[14] See, e.g., *Duty* v. *Norton-Alcoa Proppants*, 293 F.3d 481, 489–90 (8th Cir. 2002); *Wade* v. *Knoxville Utilities Board*, 259 F.3d 452, 460 (6th Cir. 2001); *Smith* v. *United Parcel Service of America, Inc.*, 65 F.3d 266, 268 (2d Cir. 1995); *Hamilton* v. *1st Source Bank*, 928 F.2d 86, 88–89 (4th Cir. 1990) (en banc); *Chapman* v. *Homco, Inc.*, 886 F.2d 756, 758 (5th Cir. 1989), cert. denied, 494 U.S. 1067, 110 S. Ct. 1784, 108 L. Ed. 2d 785 (1990); *Mull* v. *ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 288 (7th Cir. 1986).

termination. Most notably, the plaintiff filed suit alleging age discrimination in violation of both federal *and* state law.[15] Id., 946. The United States Court of Appeals for the Sixth Circuit first addressed the plaintiff's federal claim under the ADEA. Applying the *Ricks-Chardon* rule, the court concluded that the plaintiff's claim was untimely filed. Id., 947–48.

The court then turned its attention to the plaintiff's state law claim under Michigan's civil rights act. It stated: "[The plaintiff] contends that Michigan law, unlike *Ricks* and *Chardon*, starts the statute of limitations from the date of actual discharge rather than the date of notification of discharge. . . . [The plaintiff's] suit is timely if the period of limitations accrues from the date of discharge, but is untimely if that period accrues from the day [the defendant] notified him they were terminating him." Id., 948. The court continued: "Unfortunately, the Michigan Supreme Court has never addressed this question. . . . [O]ur task is to divine what the Michigan high court would say if faced with the issue. . . . Our guess is that if it were confronted with the issue before us, the Michigan Supreme Court would veer away from the current federal precedent and declare that the period of limitations for the plaintiff's [state] claim began to run the date plaintiff actually stopped working . . . ." Id., 948–49. The Sixth Circuit thus held that the state claim was timely.[16] Id., 950–51.

In light of the foregoing, it appears to us that although the *Ricks-Chardon* rule is the law of the land in regard to federal claims of discriminatory discharge, it is not a fortiori the appropriate standard for claims arising

---

[15] At no point in the proceedings has the plaintiff in the present case raised a federal cause of action.

[16] Although the dissent is concerned by the potential for a "schizophrenic application of the law" that "may lead to curious results in federal court," the Sixth Circuit had little difficulty applying the respective state and federal law in *Janikowski*.

under Connecticut law. As our Supreme Court has explained, "under certain circumstances, federal law defines the beginning and not the end of our approach to the subject." (Internal quotation marks omitted.) *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989).

The decisions of sister states construing similar statutory provisions also inform our interpretation of § 46a-82 (e). See *Johnson* v. *Manson*, supra, 196 Conn. 318–19; *State* v. *Elliott*, 177 Conn. 1, 5, 411 A.2d 3 (1979). Whether to adopt the *Ricks-Chardon* rule is a question on which sibling authority is split.

A majority of jurisdictions have applied the *Ricks-Chardon* rule as a matter of state law in discriminatory discharge cases.[17] In so doing, they rely primarily on the United States Supreme Court's statement that the discriminatory act occurs when termination is communicated to an employee, rather than when it is effectuated. However, as one court recently observed, "[o]f the states that adopted [the] *Ricks/Chardon* [rule] . . . many have done so with little analysis or discussion.

---

[17] See *Quicker* v. *Colorado Civil Rights Commission*, 747 P.2d 682, 683 (Colo. App. 1987); *St. Petersburg Motor Club* v. *Cook*, 567 So. 2d 488, 489–90 (Fla. App. 1990); *Humphreys* v. *Riverside Mfg. Co.*, 169 Ga. App. 18, 19, 311 S.E.2d 223 (1983); *Allen* v. *Lieberman*, 359 Ill. App. 3d 1170, 1178, 836 N.E.2d 64 (2005); *Keene* v. *Marion County Superior Court*, 823 N.E.2d 1216, 1218 (Ind. App. 2005), vacated and aff'd on other grounds, 849 N.E.2d 1141, 1142 (Ind. 2006); *Wagher* v. *Guy's Foods, Inc.*, 256 Kan. 300, 309–10, 885 P.2d 1197 (1994); *Eastin* v. *Entergy Corp.*, 865 So. 2d 49, 53–54 (La. 2004); *Wheatley* v. *American Telephone & Telegraph Co.*, 418 Mass. 394, 399–400, 636 N.E.2d 265 (1994) (distinguishing *Ricks* factually but adopting its rule); *Turner* v. *IDS Financial Services, Inc.*, 471 N.W.2d 105, 107–108 (Minn. 1991); *Weber* v. *Moses*, 938 S.W.2d 387, 393 (Tenn. 1996); *Specialty Retailers, Inc.* v. *DeMoranville*, 933 S.W.2d 490, 492–93 (Tex. 1996); *Clarke* v. *Living Scriptures, Inc.*, 114 P.3d 602, 604–605 (Utah App. 2005); *Hinman* v. *Yakima School District No. 7*, 69 Wash. App. 445, 449–50, 850 P.2d 536 (1993), review denied, 125 Wash. 2d 1010, 889 P.2d 498 (1994); *Naylor* v. *West Virginia Human Rights Commission*, 378 S.E.2d 843, 845–46 (W. Va. 1989); *Hilmes* v. *Dept. of Industry, Labor & Human Relations*, 147 Wis. 2d 48, 52, 56, 433 N.W.2d 251 (Wis. App. 1988).

. . . These cases . . . following *Ricks/Chardon*, appear to us to adopt the rule out of convenience because their state provisions are sufficiently similar to Title VII and [because] the Supreme Court has spoken on the federal side of the issue." *Haas* v. *Lockheed Martin Corp.*, 396 Md. 469, 487–88, 914 A.2d 735 (2007). Likewise, the trial court in this case applied the *Ricks-Chardon* rule without a substantive discussion of the competing interests and policies involved therein.

One case that addresses policy considerations is *Turner* v. *IDS Financial Services, Inc.*, 471 N.W.2d 105 (Minn. 1991). In urging adoption of the *Ricks-Chardon* rule, the defendant in that case argued that (1) the date of termination also is not always easily identifiable, (2) the purpose of an employer's notice of termination is to give the discharged employee time to look for another job, (3) an action for injunctive relief and prospective salary loss can be commenced at date of notice of termination and (4) notice of termination is a very significant event that alerts the employee to the need to seek legal advice. Id., 107. Nevertheless, noting that "the competing arguments tend to counterbalance each other"; id.; the court adopted the *Ricks-Chardon* rule without reliance on any particular policy consideration. Id., 108.

A minority of states have rejected the *Ricks-Chardon* rule.[18] In so doing, they have delved into discussions

[18] See *Romano* v. *Rockwell International, Inc.*, 14 Cal. 4th 479, 495, 926 P.2d 1114, 59 Cal. Rptr. 2d 20 (1996); *Ross* v. *Stouffer Hotel Co. (Hawai'i) Ltd.*, 76 Haw. 454, 461, 879 P.2d 1037 (1994); *Haas* v. *Lockheed Martin Corp.*, supra, 396 Md. 500; *Collins* v. *Comerica Bank*, 468 Mich. 628, 633, 664 N.W.2d 713 (2003); *Appeal of Pritchard*, 137 N.H. 291, 294, 627 A.2d 102 (1993); *Homlin* v. *TRW, Inc.*, 330 N.J. Super. 30, 46, 748 A.2d 1141 (App. Div. 2000), aff'd, 167 N.J. 205, 770 A.2d 283 (2001); *Renegar* v. *R.J. Reynolds Tobacco Co.*, 145 N.C. App. 78, 79–80, 549 S.E.2d 227, review denied, 354 N.C. 220, 554 S.E.2d 344 (2001); *Oker* v. *Ameritech Corp.*, 89 Ohio St. 3d 223, 225–26, 729 N.E.2d 1177 (2000); *Stupek* v. *Wyle Laboratories Corp.*, 327 Or. 433, 439–40, 963 P.2d 678 (1998).

of the practical effects of such filing requirements in discriminatory discharge cases and have emphasized the remedial nature of such legislation. An illustrative decision is *Homlin* v. *TRW, Inc.*, 330 N.J. Super. 30, 748 A.2d 1141 (App. Div. 2000), aff'd, 167 N.J. 205, 770 A.2d 283 (2001). As is the case here, the defendant in *Homlin* claimed that the *Ricks-Chardon* rule was well established law. Id., 37. The Appellate Division of the New Jersey Superior Court thought otherwise, flatly rejecting the *Ricks-Chardon* rule: "We see no reason to adopt the arbitrary rule of *Ricks* and *Chardon*. . . . [N]either those cases nor any of the decisions that follow them contain any persuasive discussion of a sound policy basis for selecting that rule." Id., 46. The court then set forth what it deemed "compelling reasons for a contrary rule. . . . First, until an employee is actually terminated, a seemingly final decision may well be reconsidered and perhaps reversed. There is no reason to encourage litigation which might preclude the possibility of reconsideration. . . . Second, a rule which triggers running of the limitation period on the date of actual termination provides a brightline date and eliminates much of the tortuous litigation and hairsplitting . . . where courts [have] to determine when an employee knew or should have known that he was definitely going to be terminated. In addition, a rule which dates running of the limitation period from the actual termination of a plaintiff's employment conforms with a basic proposition of our law: a cause of action accrues when a plaintiff has been injured or damaged. Prior to that date, he or she is faced only with an anticipation of possible injury, which may or may not occur, depending upon whether the employee is actually terminated." (Citations omitted; internal quotation marks omitted.) Id. The court thus held that the filing period for the discriminatory discharge complaint in *Homlin* "began to run on plaintiff's last day of work . . . ." Id.;

accord *Romano* v. *Rockwell International, Inc.*, 14 Cal. 4th 479, 493–500, 926 P.2d 1114, 59 Cal. Rptr. 2d 20 (1996); *Ross* v. *Stouffer Hotel Co. (Hawai'i) Ltd.*, 76 Haw. 454, 461–62, 879 P.2d 1037 (1994); *Haas* v. *Lockheed Martin Corp.*, supra, 396 Md. 494–500.

## III

In reviewing precedent that has considered the question before us, we agree with the observation of the Appellate Division of the New Jersey Superior Court that neither *Ricks* nor *Chardon*, nor any of the decisions that followed them contains a persuasive analysis as to why we should adopt the *Ricks-Chardon* rule. See *Homlin* v. *TRW, Inc.*, supra, 330 N.J. Super. 46. To the contrary, we find most compelling the rationales set forth by those jurisdictions that have rejected that rule. They relate directly to both the stated legislative policy of avoiding the dismissal of potentially meritorious claims due to late filing and the remedial nature of our antidiscrimination statutes. As it is our fundamental responsibility to ascertain and give effect to the apparent intent of the legislature; *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 405, 891 A.2d 959 (2006); the following considerations inform our interpretation of § 46a-82 (e).[19]

[19] Writing for the court in *Waters* v. *Autuori*, 236 Conn. 820, 676 A.2d 357 (1996), former Chief Justice Peters observed that "[i]t is axiomatic that we must consider such policy concerns as are relevant because [i]t is a fundamental assumption of jurisprudence that rules of law have an impact on the manner in which society conducts its affairs." (Internal quotation marks omitted.) Id., 835. As the dissent points out, numerous state and federal courts have scrutinized the policy considerations at play in resolving the issue presently before this court. See, e.g., *Bonham* v. *Dresser Industries, Inc.*, supra, 569 F.2d 187; *Haas* v. *Lockheed Martin Corp.*, supra, 396 Md. 469; *Turner* v. *IDS Financial Services, Inc.*, supra, 471 N.W.2d 105. *Ricks* itself discusses several policy considerations. See *Delaware State College* v. *Ricks*, supra, 449 U.S. 256–57, 259 n.11, 259–60, 262 n.16. The dissent nevertheless suggests that *our* consideration thereof usurps the legislative function. Although we agree that it is the exclusive province of the General Assembly to amend our antidiscrimination statutes as it sees fit, when confronted with a question of statutory interpretation in which the plain

As the Third Circuit warned, courts must be mindful that it is often laymen, not lawyers, who initiate the complaint process. *Ricks* v. *Delaware State College*, supra, 605 F.2d 713. The United States Supreme Court itself acknowledged that point, noting that "the limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." *Delaware State College* v. *Ricks*, supra, 449 U.S. 262 n.16. Many, if not most, employees become aware of legal remedies for discriminatory discharge only after the cessation of employment. As one court noted, "[w]ere the time for filing an administrative complaint to begin . . . upon notification that the employer intended to discharge an employee, it is likely that many employees would have little or, perhaps, no time left to invoke the protections conferred by [the state statutory scheme] following an unlawful discharge. *Ross* v. *Stouffer Hotel Co. (Hawai'i) Ltd.*, supra, 76 Haw. 462. Our construction of § 46a-82 (e) recognizes that reality.

It is basic to our law that a cause of action accrues when a plaintiff has been injured or damaged. The *Ricks-Chardon* rule confounds that principle by requiring an employee, in discriminatory termination of employment cases, to file a claim disputing events that have not yet come to pass. As the Supreme Court of California observed, "[i]n the nonacademic setting, notification of termination is not comparable to a denial of tenure—termination is not the inevitable result, because in the nonacademic setting termination of employment does not ensue inevitably once notification of termination has been given." *Romano* v. *Rockwell International, Inc.*, supra, 14 Cal. 4th 497. Until the

language admittedly provides no guidance, on our shoulders falls the task of effectuating the intent of the legislature.

actual date of termination arrives, the employer's allegedly discriminatory act remains subject to change.[20] For that reason, the better rule is one which facilitates conciliation whenever possible. "There is no reason to encourage litigation which might preclude the possibility of reconsideration." (Internal quotation marks omitted.) *Homlin* v. *TRW, Inc.*, supra, 330 N.J. Super. 46. The Court of Appeals of Maryland explained that "[t]he *Ricks/Chardon* rule frustrates [the] conciliation process . . . . Because the rule establishes that accrual begins upon notification, it behooves discharged employees to file a lawsuit as soon as possible to avoid having their claims barred under the statute of limitations. . . . [T]he *Ricks/Chardon* rule motivates the employee to file a lawsuit regardless of whether the conciliation process is concluded. . . . [T]his choice represents a poor public policy where either a chilling effect on the employee filing in the most timely manner occurs, or the employee sues his or her employer before the termination becomes final, thus dooming any chance at conciliation." *Haas* v. *Lockheed Martin Corp.*, supra, 396 Md. 496–97. Such unripe and anticipatory lawsuits "should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy." *Chardon* v. *Fernandez*, supra, 454 U.S. 9 (Brennan, J., dissenting).

In addition, requiring an employee to file a complaint while still employed may engender hostility in the workplace. It places employees in the uncomfortable position of having to sue an employer with whom they presently have, and often with whom they are trying to maintain, a job.[21]

---

[20] This rationale is particularly compelling in the present case, as every other power plant employee at the time of the June 30, 2000 closure still was employed by the defendant when the plaintiff received the December 13, 2002 notice of termination.

[21] The plaintiff's desire to remain in the defendant's employ is not contested.

A rule predicated on the date of unequivocal notice presents problems for both litigants and the court. As the present case exemplifies, determining precisely when unequivocal notice of termination has been provided can be a daunting task.[22] As a result, "protracted and expensive litigation over the precise date and adequacy of an employer's notice of termination" often ensues. *Ross* v. *Stouffer Hotel Co. (Hawai'i) Ltd.*, supra, 76 Haw. 462. By contrast, measuring the filing period from the actual cessation of employment provides a more practical and workable guide to employees and courts alike. For employees, that date represents the most logical date from which to measure their statutory right. For employers, such a rule makes clear how their record keeping and termination proceedings must be approached in order to defend properly against a discriminatory discharge action. For courts, while determining with precision exactly when an employee

---

[22] Discriminatory practices by an employer do not always occur in precise, well defined moments capable of ready identification. In applying the *Ricks-Chardon* rule, the trial court found that the plaintiff received notice of the termination of his employment "sometime before November 13, 2002 . . . ." Federal law requires that an "employer must give the employee unequivocal notice of its final termination decision." (Internal quotation marks omitted.) *Flannery* v. *Recording Industry Assn. of America*, 354 F.3d 632, 637 (7th Cir. 2004); see also *Smith* v. *United Parcel Service of America, Inc.*, 65 F.3d 266, 268 (2d Cir. 1995) (holding that "for the notice to be effective, it must be made apparent to the employee that the notice states the 'official position' of the employer").

The defendant in the present case offered no evidence whatsoever that it ever officially and unequivocally communicated a final notice of termination to the plaintiff prior to Smith's December 13, 2002 letter. The application of the *Ricks-Chardon* rule by the trial court contains a cursory discussion of that requirement. Viewed in the light most favorable to the plaintiff, the fact that (1) the plaintiff was informed on February 25, 2000, that his position would be eliminated, yet nevertheless remained in the defendant's employ for almost two years thereafter and (2) no notice of termination document or affidavit concerning such notification by the defendant or its agents accompanied the defendant's motion for summary judgment together suggest that a genuine issue of material fact may exist as to whether the defendant provided the plaintiff with *unequivocal* notice of its *final* and *official* termination decision prior to Smith's December 13, 2002 letter.

received unequivocal notice of an upcoming termination frequently is a cumbersome task involving tortuous litigation and hairsplitting, an employee's last date of employment can be identified with little difficulty or dispute.[23]

In *Ricks*, the United States Supreme Court focused on the policy of preventing litigation of stale claims, stating that "[i]t should not be forgotten that time-limitations provisions themselves promote important interests; the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." (Internal quotation marks omitted.) *Delaware State College* v. *Ricks*, supra, 449 U.S. 259–60. That concern is unwarranted in the context of discriminatory discharge complaints to the commission. The 180 day filing period specified by § 46a-82 (e) is very short, as ordinarily is the period between notice of and actual discharge. Moreover, the entirety of the termination process is within the control of the employer. Accordingly, employers "may not maintain credibly an argument that they would be without adequate notice" of a discriminatory discharge claim. *Haas* v. *Lockheed Martin Corp.*, supra, 396 Md. 499.

The fact that the entirety of the termination process is within the control of the employer presents a further concern. Were we to hold that the filing period of § 46a-82 (e) commences upon unequivocal notification of termination, the cunning employer could foreclose any and all complaints to the commission by simply setting the effective date of termination at some point beyond 180 days. Plainly, that is not what the General Assembly intended in enacting this remedial legislation. Yet,

---

[23] The record is clear that the plaintiff's final day of employment was January 21, 2003.

should we adopt the *Ricks-Chardon* rule, the evisceration of an employee's statutory right under CFEPA may result.

As we have noted, Connecticut law favors a determination on the merits of the dispute whenever possible. The legislative history of § 46a-82 (e) indicates that the legislature sought to avoid the dismissal of complaints under § 46a-82 (e) due to late filing. Our interpretation of § 46a-82 (e) must be mindful of that legislative policy.

Finally, the fact that § 46a-82 (e) is part of a remedial statutory scheme cannot be disregarded.[24] Accordingly, § 46a-82 (e) must be liberally construed in favor of those whom the legislature intended to benefit. See *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, supra, 238 Conn. 355.

Section 46a-82 (e) requires the filing of a complaint within 180 days of "the alleged act of discrimination . . . ." The act alleged in the plaintiff's complaint is the termination of his employment. Among the discriminatory practices proscribed by § 46a-60 (a) (1) is "discharge from employment . . . ." That language dates back to 1947, when our General Assembly enacted Connecticut's first unfair employment practices statute. See General Statutes (Cum. Sup. 1947) § 1364i. The term "discharge" in the employment context means "[t]o dismiss from employment; to terminate the employment of a person." Black's Law Dictionary (6th Ed. 1990) p. 463; see also Webster's Third New International Dictionary, p. 644. Liberally construing that statutory provision

---

[24] In neither *Ricks* nor *Chardon* did the United States Supreme Court acknowledge the remedial nature of the legislative acts in question. Contra *Romano* v. *Rockwell International, Inc.*, supra, 14 Cal. 4th 494; *Haas* v. *Lockheed Martin Corp.*, supra, 396 Md. 498. The dissent likewise fails to give proper weight to the remedial nature of our antidiscrimination statutes. In our eyes, we must accord great deference to that remedial purpose. See *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U.S. 618, 659, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007) (Ginsburg, J., dissenting) (interpreting Title VII requires "fidelity to the [a]ct's core purpose").

and mindful of the legislature's intent to avoid the defeat of such complaints for filing faults rather than on their merits, we conclude that the filing period contained in § 46a-82 (e) commences upon actual cessation of employment, rather than notice thereof.[25]

## IV

Our fair employment practices statutes were enacted to eliminate discrimination in employment. They are remedial and receive a liberal construction. We therefore conclude that in an age discrimination action in which the allegedly discriminatory practice is the termination of employment, the alleged act of discrimination transpires on the final date of employment, rather than when the employee receives notice of termination. Accordingly, any complaint must be filed with the commission within 180 days of that date.

It is undisputed that the plaintiff's final day of employment was January 21, 2003. Filed on June 3, 2003, the plaintiff's complaint to the commission was within the 180 day period of § 46a-82 (e) and, hence, was timely. The trial court incorrectly concluded otherwise, and summary judgment should not have been rendered in favor of the defendant on that ground.

## V

The defendant alternatively claims that summary judgment was appropriate because (1) the plaintiff failed to establish a prima facie case of age discrimination and (2) the defendant articulated a nondiscriminatory reason for the termination of the plaintiff's employment. Although the trial court did not rule on those alternate grounds for summary judgment, it is within our discretion to do so on appeal. See *Skuzinski*

---

[25] The General Assembly, of course, is free to revisit the parameters of General Statutes § 46a-82 (e) as it deems necessary to further effectuate the legislative policy that CFEPA was designed to implement.

v. *Bouchard Fuels, Inc.*, 240 Conn. 694, 702, 694 A.2d 788 (1997). We disagree that summary judgment is appropriate on either ground.

As our Supreme Court explained, "[w]hen a plaintiff claims disparate treatment under a facially neutral employment policy, this court employs the burden-shifting analysis set out by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this analysis, the employee must first make a prima facie case of discrimination. The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." *Craine* v. *Trinity College*, 259 Conn. 625, 636–37, 791 A.2d 518 (2002). That test is a flexible one. *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 253 n.6, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

To establish a prima facie case of discrimination, the complainant must demonstrate that (1) he is in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 505, 832 A.2d 660 (2003). "The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor." *Craine* v. *Trinity College*, supra, 259 Conn. 638.

It is uncontested that every other power plant employee at the time of the June 30, 2000 closure was younger than the plaintiff and was still employed by the defendant when the plaintiff received the December

13, 2002 notice of termination. Simply put, the plaintiff was the only power plant employee discharged by the defendant. In applying the analytical framework enunciated in *McDonnell Douglas Corp.*, the United States Court of Appeals for the Tenth Circuit held that "[e]vidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent and to require the employer to articulate reasons for its decision." *Branson* v. *Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir. 1988). Moreover, the United States Court of Appeals for the Second Circuit has noted that "[i]n cases involving a reduction in force, the inquiry is highly fact specific." *Burger* v. *New York Institute of Technology*, 94 F.3d 830, 833 (2d Cir. 1996). It continued: "[A] laid-off employee who does not have a functional counterpart in the company—that is, there is no similar job—is not necessarily precluded for that reason from bringing an ADEA action," particularly where the employer transferred many of the terminated employee's duties to another department or employee. Id., 834. The plaintiff introduced documentary evidence indicating that the majority of his duties were transferred to another employee of the defendant. Exhibits C and D, which were appended to the plaintiff's memorandum of law in opposition to the defendant's motion for summary judgment, reveal that more than 65 percent of the plaintiff's duties were transferred to Michael C. Holmes.[26] Furthermore, in a subsequent correspondence to Holmes, Smith stated that "[t]he bottom line

[26] Exhibit C was Smith's letter to Shelby Jackson, a union representative. That letter states in relevant part: "[F]ifty percent . . . of [the plaintiff's] time was associated with developing bid specifications/documents for the Electric Division, including review and recommendation of award. In reviewing job descriptions, this is clearly the function of the Assistant General Manager-Electric. . . . [T]he third largest element of work (15%) [was] 'a technical and administrative contact person for safety and environmental concerns.' Again, the Assistant General Manager's position covers these functions. . . . The only other area of significant activity involves the direction of activities of the System Operator work group. . . . There is no longer

is that we are protecting five jobs without changing salary in spite of the fact that the primary function of their existing job description is to operate a power plant." That document also was attached to the plaintiff's memorandum. In light of the foregoing, we conclude that the plaintiff established a prima facie case of discrimination.

The defendant nevertheless maintains that it articulated a nondiscriminatory reason for the termination of the plaintiff's employment, namely, that the position of power plant superintendent no longer existed.[27] To survive the motion for summary judgment, therefore, the plaintiff was required to demonstrate that the reason proffered by the defendant is merely a pretext and that

a need to schedule workers for the operation of the power plant and they have established a five man rotation work schedule which can be overseen by the Assistant General Manager. You will note that some of the work will fall to the Assistant General Manager. However, Mr. Holmes is a highly paid, well-qualified individual who is 'highly responsible' for . . . managerial support to the utility's General Manager whose duties also include '. . . supervis[ing] subordinate managerial and staff employees.' It is possible that Mr. Holmes may want to reassign various portions of [his] duties to complement his work schedule, however, it is believed by myself and the Commission that his work can be reasonably performed by Mr. Holmes."

Likewise, exhibit D was a memorandum from Smith to Holmes. It stated in relevant part: "Very soon, there will be only four months of funding remaining for the Power Plant Superintendent position. One of the areas of concern that I think needs immediate attention will be replacement as the Spill Prevention Control Coordinator (SPCC). I am hereby designating you as the future [SPCC] Coordinator, as a result of your knowledge of the issues and experience in that area. . . . Another area that will need attention at the end of the year is the supervisory designee to replace [the plaintiff] for the Systems Operators/Utility Operators. . . . Inasmuch as system operations are essentially a distribution function, I believe that it would be appropriate for you to take direct control of these individuals for the foreseeable future . . . ."

[27] The defendant specifically relies on the affidavit of Terence P. Sullivan, its personnel director. In that document, Sullivan averred, inter alia, that "on or about January 21, 2003, the plaintiff's position as Power Plant Superintendent was eliminated as the Pierce Power Plant Station had ceased operations" and that "no person, younger or older, has filled the plaintiff's former position as Power Plant Superintendent."

the decision actually was motivated by an illegal discriminatory bias. See *McDonnell Douglas Corp.* v. *Green,* supra, 411 U.S. 792.

An employee may demonstrate pretext "by reliance on the evidence that established her prima facie case, without any additional evidence being required . . . ." (Citation omitted.) *Gallo* v. *Prudential Residential Services Ltd. Partnership,* 22 F.3d 1219, 1226 (2d Cir. 1994). The evidence submitted by the plaintiff indicates that although the position of power plant superintendent was eliminated, several of that position's duties were not. Instead, they were transferred to another employee.

In *Montana* v. *First Federal Savings & Loan Assn. of Rochester,* 869 F.2d 100 (2d Cir. 1989), the court explained that the plaintiff was "not required to show that age was the only factor in [the defendant's] decision" nor that the defendant's proffered reason was false; rather, her burden was to establish that the defendant's "stated reason was not the only reason and that her age did make a difference." Id., 105. Among the factors noted by the Second Circuit were that (1) at the time of her discharge, the plaintiff was the oldest and highest paid employee in the defendant's personnel department; (2) she was the only department head whose position was consolidated and whose staff continued without her; (3) she was not offered the opportunity to transfer; (4) after her discharge, her duties were not eliminated, but instead were reassigned to a coworker; and (5) that coworker's workload increased by 15 to 20 percent. Id. The court thus concluded that "[w]hen viewed together, these circumstances create a genuine factual issue as to whether [the defendant's] stated reason for terminating [the plaintiff]—the centralization of its personnel department in Rochester and accompanying reduction in force—was pretextual and,

thus, as to whether age was a factor in [its] decision to terminate [the plaintiff]." Id., 106.

The plaintiff in the present case submitted a similar factual basis in opposing the defendant's motion for summary judgment. The plaintiff was the oldest power plant employee and the only one who was not transferred to another position with the defendant. Although the position of power plant superintendent was eliminated, the bulk of the plaintiff's duties was transferred to another employee. In addition, the plaintiff presented evidence in the form of a letter from that employee to Smith indicating that his workload would increase as a result thereof.[28]

Viewing that evidence in the light most favorable to the plaintiff, we conclude that a genuine question of material fact exists as to whether the defendant's stated reason for terminating the plaintiff's employment was a pretext for discharging him on the basis of his age. Summary judgment, therefore, was inappropriate.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion SCHALLER, J., concurred.

McLACHLAN, J., dissenting. I respectfully disagree with the majority's conclusion that we should part ways

---

[28] Holmes' memorandum to Smith, dated September 4, 2002, stated in relevant part: "This writing is to acknowledge receipt of your memorandum of August 22, 2002 pertaining to designation of myself as the Coordinator for the Spill Prevention Control and Countermeasures (SPCC) Plan for the Electric Division, as well as supervisory designee for the Turbine Utility Operators, beginning January 1, 2003. Both of these areas of responsibility have traditionally been performed by the Power Plant Superintendent . . . . I was surprised to receive your memorandum . . . . I had not considered these added responsibilities prior to your writing, and I am referring this proposal to the Wallingford Management Union-Local 17 of the Connecticut Independent Labor Union for their review and consideration."

with well established United States Supreme Court precedent and a majority of jurisdictions throughout the nation.

Our Supreme Court has determined that when an overlap between state and federal law is deliberate, federal precedent is particularly persuasive. *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, 273 Conn. 373, 386, 870 A.2d 457 (2005). Conversely, we have been reluctant to interpret state statutory schemes in a manner at odds with federal schemes on which they are modeled. See, e.g., *Blasko* v. *Commissioner of Revenue Services*, 98 Conn. App. 439, 456, 910 A.2d 219 (2006) (finding "highly significant" that federal tax code permitted plaintiffs to claim credit, while interpretation of state credit scheme, which sought "to mirror the federal credit scheme" disallowed application of any credit).

In drafting and modifying the Connecticut Fair Employment Practices Act (CFEPA), General Statutes § 46a-51 et seq., our legislature modeled CFEPA after its federal counterpart, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et. seq., and it has sought to keep our state law consistent with federal law in this area. See, e.g., *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, supra, 273 Conn. 385 ("[w]ith the intent of creating a state antidiscrimination housing statute consistent with its federal counterpart, the legislature adopted [General Statutes] § 46a-64c and related provisions"). Accordingly, in matters involving the interpretation of the scope of our antidiscrimination statutes, our courts consistently have looked to federal precedent for guidance. *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 164, 717 A.2d 1254 (1998) ("[i]n defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964,

the federal statutory counterpart to [General Statutes] § 46a-60").

The issue before us concerns the proper interpretation of CFEPA's filing limitations statute, General Statutes § 46a-82 (e), which provides in relevant part: "Any complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination . . . ." Where, as here, the alleged act of discrimination is the termination of employment, § 46a-82 (e) provides no guidance to assist us in determining precisely at what point the alleged act of discrimination occurs. As the majority correctly notes, therefore, this issue presents a question of first impression in Connecticut that requires us to look to extratextual evidence to determine at what point the "discharge from employment" arises, triggering the 180 day filing limitations period in § 46a-82 (e). See General Statutes § 1-2z.

Beginning with the legislative history, in modifying the filing limitations period set forth in § 46a-82 (e), the legislature has expressed its clear intent to keep state law *consistent* with federal law. *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 275, 777 A.2d 645 (" 'The 1974 [G]eneral [A]ssembly increased the period for filing complaints with the [c]ommission from ninety to one hundred eighty days after the alleged act of discrimination, *which reflected its concern for consistency with the federal legislation* and presumably extended that back pay to one hundred eighty days.' 18 H.R. Proc., Pt., 2, 1975 Sess., pp. 908–909." [Emphasis added; internal quotation marks omitted.]), aff'd after remand, 67 Conn. App. 316, 786 A.2d 1283 (2001). Thus, it is no coincidence that § 46a-82 (e) is, in all relevant respects, identical to its federal counterpart, 42 U.S.C. § 2000e-5 (e) (1), which provides in relevant part that "[a] charge under this section shall

be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ."

The majority references portions of the legislative history of § 46a-82 (e) as evidence that the legislature sought to avoid the dismissal of complaints due to late filing and concludes that "[o]ur interpretation of § 46a-82 (e) must be mindful of that legislative policy." However, the majority fails to address adequately why we should ignore the expressly stated legislative intent to keep the statute consistent with its federal counterpart and "to bring state law into accord with federal law." *Williams* v. *Commission on Human Rights & Opportunities*, supra, 257 Conn. 274.[1] Because we are asked to interpret the provisions of a state statute that is virtually identical to its federal counterpart, and our legislature has clearly expressed its intent to harmonize state law with federal law in this area, I find no compelling reason why we should not accord great deference to the United States Supreme Court, which has already resolved the issue before us.[2]

---

[1] The majority acknowledges that in amending General Statutes § 46a-82 (e), the legislature's intent to promote consistency with federal law was "[e]qually significant" to the legislature's concern for ensuring that potentially meritorious claims were not dismissed due to late filing; however, the majority declines to give equally significant weight to the legislature's clearly stated intent to align state law with federal law in this area. Seeking to discount the importance of that intent, the majority points out that the rule established by the United States Supreme Court in *Delaware State College* v. *Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980), and *Chardon* v. *Fernandez*, 454 U.S. 6, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981), was enunciated after the 1975 amendment. The majority has cited nothing from the legislative history to support that federal court decisions related to the date of accrual of a discriminatory discharge claim were considered by the legislature in its adoption of the amendment. Thus, it is pure speculation to infer that the legislature would depart from its expressly stated intent in light of *Ricks* and *Chardon*.

[2] It is axiomatic that Connecticut is the final arbiter of its laws. Where, as here, our legislature has deliberately overlapped state law with federal law and has expressed its intent to be guided by federal law in this area, we are compelled to consider United States Supreme Court precedent to be particularly persuasive not simply because the decision emanated from that court, but because our Supreme Court has instructed us to do so. See

In *Delaware State College* v. *Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980), the United States Supreme Court held that the period for filing a discriminatory discharge complaint accrues when the employer unequivocally notifies the employee of termination. Similarly, in *Chardon* v. *Fernandez*, 454 U.S. 6, 8, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981), the court explained: "[R]espondents were notified, when they received their letters [giving them specific dates when their employment would end], that a final decision had been made to terminate their appointments. The fact that they were afforded reasonable notice cannot extend the period within which suit must be filed." As the majority concedes, the *Ricks-Chardon* rule has been applied uniformly in lower federal courts in filing limitation cases[3]

*Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, supra, 273 Conn. 386 ("when the overlap between state and federal law is deliberate . . . federal decisions are particularly persuasive"). As discussed in this opinion, in resolving the issue before us, it is clear that the final arbiter should be the General Assembly and not this court.

[3] See *Stewart* v. *Booker T. Washington Ins.*, 232 F.3d 844 (11th Cir. 2000) (statute of limitations begins to run when employee informed her employment is being terminated); *Thomas* v. *Eastman Kodak Co.*, 183 F.3d 38 (1st Cir. 1999) (holding action for discrimination began to accrue when employee notified of layoff), cert. denied, 528 U.S. 1161, 120 S. Ct. 1174, 145 L. Ed. 2d 1082 (2000); *Joseph* v. *New York City Board of Education*, 171 F.3d 87 (2d Cir.) (stating action for discriminatory discharge begins to accrue when employee notified of employer's discriminatory decision), cert. denied, 528 U.S. 876, 120 S. Ct. 182, 145 L. Ed. 2d 154 (1999); *McCoy* v. *San Francisco City & County*, 14 F.3d 28, 29 (9th Cir. 1994) ("[t]he touchstone for determining the commencement of the limitations period is notice"); *Lever* v. *Northwestern University*, 979 F.2d 552 (7th Cir. 1992) (holding action for gender discrimination accrued from time professor informed she would not be given tenure), cert. denied, 508 U.S. 951, 113 S. Ct. 2443, 124 L. Ed. 2d 661 (1993); *English* v. *Whitfield*, 858 F.2d 957 (4th Cir. 1988) (holding discrimination claim brought under employee protection section of Energy Reorganization Act of 1974, 42 U.S.C. § 5851, time barred because action began to accrue upon employee's notification of termination); *Janikowski* v. *Bendix Corp.*, 823 F.2d 945 (6th Cir. 1987) (holding discrimination claim brought under Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., began to accrue upon employee's notification of termination); *Bronze Shields, Inc.* v. *New Jersey Dept. of Civil Service*, 667 F.2d 1074 (3d Cir. 1981) (holding action for discrimination accrued when state civil service promulgated eligi-

and adopted by a majority of state courts throughout the nation.[4]

The majority relies on our Supreme Court's explanation that we may depart from federal precedent "under certain circumstances." *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989). On the basis of policy concerns arising from the application of the *Ricks-Chardon* rule, the majority concludes that it is appropriate not to follow the rule because CFEPA is a remedial statutory scheme, designed to avoid the dismissal of complaints, and therefore must be liberally construed. In the antidiscrimination context, however, a departure from federal precedent has been recognized only in highly limited circumstances to fill in the gaps in federal legislation on matters of substance rather than on procedural issues. See *Evening Sentinel* v. *National Organization for Women*, 168 Conn. 26, 34 n.5, 357 A.2d 498 (1975) (departing from federal statute where federal statute drew distinction between sex and race discrimination). Here, we are concerned with the interpretation of a procedural time limit. It cannot be disputed that the legislature intended that *some* finite deadline would exist for filing an employment discrimination claim. See *Williams* v. *Commission on Human Rights & Opportunities*, supra, 257 Conn. 284 ("[w]e conclude that the time limit of § 46a-82 (e) is mandatory"). The majority cites no authority to support the notion that we ought to depart from sound federal precedent in interpreting a procedural statute such as § 46a-82 (e), which our legislature has amended to keep consistent with its federal counterpart.

Further, I am unconvinced that the policy considerations raised by the majority are so significant to warrant

bility roster for policemen that gave notice to plaintiffs of discriminatory decision), cert. denied, 458 U.S. 1122, 102 S. Ct. 3510, 73 L. Ed. 2d 1384 (1982).

[4] See footnote 17 of the majority opinion.

an outright rejection of federal precedent because there are sound policy considerations supporting the *Ricks-Chardon* rule. As the United States Supreme Court recently observed in a similar context: "Statutes of limitations serve a policy of repose. . . . They represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." (Citation omitted; internal quotation marks omitted.) *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U.S. 618, 630, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007) (holding that Title VII pay discrimination claim cannot be based on allegedly discriminatory events that occurred before last pay decision that affected employee's pay during relevant filing limitation period). With respect to the Title VII federal counterpart of § 46a-82 (e), therefore, the United States Supreme Court explained: "The [federal Equal Employment Opportunity Commission (EEOC)] filing deadline protect[s] employers from the burden of defending claims arising from employment decisions that are long past. . . . Certainly, the 180-day EEOC charging deadline, 42 U.S.C. § 2000e–5 (e) (1), is short by any measure, but [b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination. . . . This short deadline reflects Congress' strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation." (Citations omitted; internal quotation marks omitted.) *Ledbetter* v. *Goodyear Tire & Rubber Co.*, supra, 630–31.

Thus, as the majority notes, the *Ricks* court explained that the "limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly

assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College* v. *Ricks,* supra, 449 U.S. 256–57; see also *Haas* v. *Lockheed Martin Corp.,* 396 Md. 469, 507–508, 914 A.2d 735 (2007) (Battaglia, J., dissenting) ("I believe that the majority is wrong in rejecting the Supreme Court's *Ricks/Chardon* Rule because it fits tongue and groove with this Court's long adherence to the discovery rule, which provides that the statute of limitations begins to run when the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury, damages or potential claim. . . . We adopted the discovery rule because it provides adequate time for diligent plaintiffs to initiate an action while also ensuring fairness to defendants by encouraging the prompt filing of claims, suppressing stale or fraudulent claims, and avoiding inconvenience which may stem from delay." [Citations omitted.]). The *Ricks* court also observed that the alternative " 'final day of employment' " rule could discourage employers from giving employees a grace period to seek employment elsewhere. *Delaware State College* v. *Ricks,* supra, 260 n.12.

In following the *Ricks-Chardon* rule, many of our sister states have discussed public policy concerns in support of adopting the rule and disfavoring a contrary approach. In *Clarke* v. *Living Scriptures, Inc.,* 114 P.3d 602, 606 (Utah App. 2005), the Utah Court of Appeals explained that "[a] rule that extends the statute of limitations to the last date of employment, rather than the date the employee receives notice of termination, would discourage employers from providing post-termination benefits. See, e.g., [*Naton*] v. *Bank of* [*California*], 649 F.2d 691, 695 (9th Cir. 1981) ('[A] rule focusing on the date of termination of economic benefits might dissuade an employer from extending benefits to a discharged employee after the employee had ceased

working.'); *Bonham* v. *Dresser* [*Industries, Inc.*], 569 F.2d 187, 191–92 (3d Cir. 1977) ('We would . . . view with disfavor a rule that penalizes a company for giving an employee periodic severance pay or other extended benefits after the relationship has terminated rather than severing all ties when the employee is let go.') [cert. denied, 439 U.S. 821, 99 S. Ct. 87, 58 L. Ed. 2d 113 (1979)]." In *Hilmes* v. *Dept. of Industry, Labor & Human Relations*, 147 Wis. 2d 48, 53, 433 N.W.2d 251 (Wis. App. 1988), the Court of Appeals of Wisconsin emphasized that "[k]eying an 'occurrence' of discrimination to a time prior to termination can afford the employee an opportunity to prevent—rather than rectify—wage loss and other harmful effects of the discriminatory practice."

In *Turner* v. *IDS Financial Services, Inc.*, 471 N.W.2d 105, 108 (Minn. 1991), the Supreme Court of Minnesota determined that the date of notification was the correct measure. In so holding, the court explained that at the date of notification, the plaintiff "immediately attains a lame duck status and, prior to actual discharge, may well incur employment agency fees and sustain damages for 'mental anguish and suffering' . . . . Put another way, if the discharged employee prior to the date of actual discharge obtains another job paying as well or better, we do not think the unfair discrimination claim is always or even usually gone." (Citation omitted.) Id.

In addition to the policy concerns weighing in favor of an adoption of the *Ricks-Chardon* rule, I am also concerned that an application of the majority's holding may lead to curious results in federal court. In *Bogle-Assegai* v. *State*, 470 F.3d 498, 500 (2d Cir. 2006), the plaintiff received a letter from her employer on March 29, 2001, informing her that her employment would be terminated effective April 12, 2001. On October 1, 2001, the plaintiff filed an administrative complaint with the

EEOC and received a right to sue letter. Id. The plaintiff commenced an action against her employer, alleging, inter alia, discriminatory discharge in violation of Title VII and a violation of CFEPA. Id., 501. Relying on the March 29, 2001 date of notification, the Court of Appeals affirmed the District Court's dismissal of the plaintiff's Title VII claims on the grounds that 186 days had elapsed and therefore her administrative charge was not timely filed.[5] Id., 507. If I assume arguendo that this factual scenario were to arise in the wake of the majority's holding, and that the plaintiff's ancillary CFEPA claim had been otherwise properly filed, the federal court would be forced to engage in a schizophrenic application of the law, applying the date of termination on the state law claim and the date of notification on the federal law claim in determining whether to dismiss the action. Thus, the CFEPA claim would survive a motion to dismiss on the basis of the date of termination, yet the nearly identical Title VII claim would be subject to dismissal on the basis of the *Ricks-Chardon* rule.

Application of the majority's holding may cause equally significant uniformity problems in state court. Specifically, the court's ruling applies only in the context of termination from employment and does not clarify the application of § 46a-82 (e) to other forms of employment discrimination. If, for example, the alleged act is a discriminatory demotion, the court's departure from the *Ricks-Chardon* rule makes it entirely unclear whether the relevant filing limitations period would commence on the date of unequivocal notice of the demotion or on the date of the actual demotion.

Finally, I believe that the policy concerns raised in the majority opinion are issues that can be more appropriately addressed by the legislature. In examining the

---

[5] The District Court previously dismissed the plaintiff's state law claims on unrelated grounds, and that dismissal was not challenged on appeal. See *Bogle-Assegai* v. *State*, supra, 470 F.3d 509.

scope of our statutes, it is not the province of this court to usurp the legislative function. See *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 106, 491 A.2d 368 (1985). Although it is certainly the province of the court to consider policy matters when interpreting unclear statutes, the proper venue to consider countervailing policy concerns that arise in the context of establishing or effectively changing the duration of a limitations statute is in the legislature. See, e.g., *Sanders* v. *Officers Club of Connecticut, Inc.*, 196 Conn. 341, 353, 493 A.2d 184 (1985) ("[T]he plaintiff asks that we declare [the dram shop damages limitation statute] unconstitutional [inter alia] on the ground that the damage limitation in the statute flies in the face of the true intent of the legislature . . . . *It is settled in this state that changing the limitation is a matter for the legislature. If the damage limitation is inadequate, then the proper remedy is to increase the statutory limitation by legislative enactment rather than by overturning established judicial principles and precedents.*" [Citation omitted; emphasis added; internal quotation marks omitted.]); see also *Ledbetter* v. *Goodyear Tire & Rubber Co.*, supra, 550 U.S. 630 ("[r]espectful of the legislative process that crafted [Title VII], we must give effect to the statute as enacted . . . and we have repeatedly rejected suggestions that we extend or truncate Congress' deadlines" [citation omitted; internal quotation marks omitted]). Here, the legislature has evinced its intent to be guided by federal law in this area, and there are clearly competing policy concerns surrounding the issue. See *Turner* v. *IDS Financial Services, Inc.*, supra, 471 N.W.2d 107 ("the competing [policy] arguments tend to counterbalance each other"). Thus, if the filing limitation period is inadequate, then the proper remedy is to increase the statutory limitation by legislative enactment rather than by overturning established federal judicial principles and precedents, to which, in this

circumstance, we ought to accord great deference.[6] See generally *Sanders* v. *Officers Club of Connecticut, Inc.,* supra, 353.

Because I believe that, pursuant to the *Ricks-Chardon* rule, the alleged act of discrimination occurred when the plaintiff, Peter J. Vollemans, Jr., received unequivocal notification of the termination of his employment, I would address the plaintiff's second claim that the trial court improperly concluded that there was no genuine issue of fact as to whether the plaintiff received unequivocal notice of the termination of his employment prior to November 13, 2002. In a footnote, the majority indicates that evidence that the plaintiff was informed on February 25, 2000, that his position would be eliminated, yet remained in the employ of the defendant, the town of Wallingford, for two years thereafter, coupled with the defendant's failure to submit evidence of an unequivocal notice, suggests that a genuine issue of material fact may exist as to whether the plaintiff received unequivocal notice of the defendant's final and official termination decision.

The United States Court of Appeals for the Second Circuit has held that the statute of limitations begins to run on the date the employee receives a definite notice of termination representing the employer's official position. *Smith* v. *United Parcel Service of*

---

[6] I recognize the majority's valid concern that a six month filing limitation may lead to harsh results; see, e.g., *Ledbetter* v. *Goodyear Tire & Rubber Co.,* supra, 550 U.S. 630–31; however, the proper way to avoid such results is with a legislative enactment. Indeed, many jurisdictions have adopted similar statutes with filing limitations periods beyond 180 days. See, e.g., Cal. Gov't Code § 12960 (d) (Deering 2006) (one year); D.C. Code Ann. § 2-1403.04 (a) (LexisNexis 2001) (one year); Fla. Stat. Ann. § 760.11 (1) (West 2005) (365 days); Mass. Ann. Laws ch. 151B § 5 (LexisNexis Cum. Sup. 2007) (300 days); Mich. Comp. Laws § 600.5805 (10) (LexisNexis 2004) (three years); Minn. Stat. Ann. § 363A.28 subd. 3 (West 2004) (one year); N.Y. Exec. Law § 297 (5) (McKinney 2005) (one year); N.C. Gen. Stat. Ann. § 1-52 (5) (LexisNexis 2005) (three years); Or. Rev. Stat. § 659A.820 (1) (2005) (one year); W. Va. Code Ann. § 5-11-10 (LexisNexis 2006) (365 days).

*America, Inc.*, 65 F.3d 266, 268 (2d Cir. 1995). In *O'Malley* v. *GTE Service Corp.*, 758 F.2d 818, 820 (2d Cir. 1985), the Second Circuit affirmed the trial court's granting of summary judgment, holding that where the plaintiff confirmed knowledge of his impending early retirement in two separate documents and the defendant employer issued an announcement that the plaintiff was retiring, the plaintiff's claim was time barred. In *Stone* v. *National Bank & Trust Co.*, 1996 U.S. Dist. LEXIS 7927, *46 (N.D.N.Y. June 6, 1996) the District Court discussed that a relevant factor in granting summary judgment on grounds that the plaintiff's claim was time barred included the plaintiff's retention of counsel in connection with negotiating a severance agreement.

Here, the plaintiff concedes that in November, 2002, he was aware that the defendant was going to terminate his employment. Further, the plaintiff cannot reasonably dispute that on or prior to November 13, 2002, he retained counsel to represent him related to this termination. Most importantly, on November 13, 2002, in a letter sent to the defendant by his attorney, the plaintiff, through his attorney, stated: "As you probably know, [the plaintiff's employment] is scheduled to terminate effective on or about December 31, 2002, with the closure of the Power Plant being proffered as the alleged justification for that termination." Thus, the plaintiff's retention of counsel and the content of the letter sent to his employer by his attorney makes it overwhelmingly clear that the defendant had given the plaintiff unequivocal notice of termination sometime prior to November 13, 2002. Compare *Smith* v. *United Parcel Service of America, Inc.*, supra, 65 F.3d 267 (finding notice equivocal in that plaintiff advised by employer only that he should "think about [his] future with the company" and told he "wasn't carrying his weight" [internal quotation marks omitted]). Moreover, as the trial court properly noted in its memorandum

of decision, the defendant's December 13, 2002 letter providing the plaintiff with "*final* notice" of termination was simply further evidence that the defendant had previously given the plaintiff definite notice of the termination of his employment. (Emphasis added.)

For these reasons, I would conclude, as the trial court did, that the defendant met its burden to prove that there are no genuine issues of material fact regarding its claim that the plaintiff's complaint, which he filed with the commission on human rights and opportunities on June 3, 2003, was untimely pursuant to § 46a-82 (e). Therefore, I would affirm the judgment of the trial court rendering summary judgment in favor of the defendant.[7]

Accordingly, I respectfully dissent.

---

[7] Because I conclude that summary judgment was appropriate on this ground, I express no opinion as to the defendant's alternate claims.