******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHN DOE *v.* TOWN OF WEST HARTFORD ET AL.
(AC 37672)

Beach, Mullins and Mihalakos, Js.

Argued May 10—officially released September 20, 2016

(Appeal from Superior Court, judicial district of Hartford, Complex Litigation Docket, Sheridan, J. [motions for summary judgment]; Dubay, J. [motion to disqualify].)

*Kenneth J. Krayeske*, with whom was *Brendan Mahoney*, for the appellant (plaintiff).

*Patrick D. Allen*, with whom, on the brief, was *Scott M. Karsten*, for the appellees (named defendant et al.).

*Laura Pascale Zaino*, with whom, on the brief, were *Richard C. Tynan*, *Evan M. O'Hara*, and *Logan A. Forsey*, for the appellees (defendant Dale J. Wallington et al.).

*Michael R. McPherson*, for the appellees (defendant Hartford Hospital et al.).

*Opinion*

MULLINS, J. The plaintiff, John Doe,[1] appeals from the summary judgment rendered by the trial court, *Sheridan, J.*, after determining that the plaintiff's causes of action were time barred and were not saved by General Statutes § 52-593a.[2] The plaintiff also appeals from the decision of the court, *Dubay, J.*, denying his motion to disqualify Judge Sheridan. The defendants are: the town of West Hartford and certain members of its police department in their official and individual capacities, namely, James Strillacci, Chief of Police, Detective Donald Melanson, Officer Gino Giansanti, Officer Kimberly Sullivan, Officer Sean Walmsley, Sergeant John Silano, and Detective Michael Camilleri (collectively, town defendants); Dale J. Wallington, M.D., and Resilience Health Care, LLC (collectively, medical defendants); and Hartford Hospital, the Institute of Living, Radhika Mehendru, M.D., Carl Washburn, M.D., and Theodore Mucha, M.D. (collectively, hospital defendants).[3]

On appeal, the plaintiff claims that the court improperly rendered summary judgment despite the existence of issues of material fact regarding whether process was delivered to the marshal prior to the expiration of the various statutes of limitations for his causes of action, and that the court improperly denied the plaintiff's motion for disqualification of Judge Sheridan on the ground of judicial bias.[4] We agree that the court improperly rendered summary judgment, and, accordingly, we reverse in part and affirm in part the judgment of the trial court.[5]

Many of the underlying facts and the complicated procedural history of this case are not relevant to the issues on appeal. Accordingly, we omit them and set forth only the facts and history necessary for our consideration of the issues presented. The plaintiff alleged various wrongful conduct on the part of the defendants that he claims occurred between May 22, 2007, and June 8, 2007. He commenced this action by summons and complaint, executed on May 19, 2010. According to the marshal's return, which was signed by State Marshal John R. Griffin, the defendants all were served on June 9, 2010. Beginning on September 23, 2013, more than three years after this action was commenced, the town defendants, the medical defendants, and the hospital defendants each filed a motion for summary judgment claiming, inter alia, that the plaintiff's causes of action were time barred.[6] In response, the plaintiff contended that Griffin had picked up process on May 20, 2010, at the office of Attorney A. Paul Spinella, his attorney at the time he commenced this action, thereby saving the late service pursuant to § 52-593a. See footnote 2 of this opinion. In three separate memoranda, the court, *Sheridan, J.*, granted the defendants' motions for summary judgment on the issue of the statutes of limitations, concluding that there was no genuine issue of

material fact as to whether Griffin had received process prior to the running of the statutes of limitations, and that the defendants were entitled to judgment as a matter of law.

Thereafter, the plaintiff filed a motion to reargue and reconsider, claiming, in part, that he had newly discovered evidence in the form of e-mails that would further help to establish that Spinella's office gave process to Griffin on May 20, 2010. The court denied the plaintiff's motion.

The plaintiff also filed a motion to recuse and disqualify Judge Sheridan on the basis of alleged judicial bias, which was heard by Judge Dubay. Following the hearing, Judge Dubay denied that motion. The plaintiff subsequently filed a motion requesting that Judge Dubay articulate the basis for his denial of the motion to disqualify, which he granted. This appeal followed.[7] Additional facts will be set forth as necessary.

I

The plaintiff first claims that the trial court improperly rendered summary judgment despite the existence of issues of material fact regarding whether process was delivered to Griffin, the marshal, prior to the expiration of the statutes of limitations. He also claims that the court improperly struck Spinella's affidavit. The plaintiff argues that the defendants never established that the process was not picked up by Griffin prior to the expiration of the statutes of limitations. He further argues that the court improperly weighed the evidence, made credibility determinations, and shifted the burden of proof to him, despite there being no evidence from the movants as to when process was received by Griffin, and then held him to a higher burden of proof than was appropriate for purposes of opposing summary judgment motions. The plaintiff additionally argues that the only burden he had when opposing summary judgment was to demonstrate an issue of material fact as to whether Griffin received process prior to May 22, 2010; he contends that he certainly met that burden but that the court, improperly, required him to *prove* that process had been delivered, and it failed to view the evidence in the light most favorable to the nonmoving party. We agree that there exists a genuine issue of material fact regarding the date that process was delivered to the marshal.

The following additional facts inform our review. In September and October, 2013, the town defendants and the hospital defendants each filed a motion for summary judgment on grounds that included the expiration of the applicable statute of limitations, both citing General Statutes § 52-577.[8] The hospital defendants also cited General Statutes § 52-584,[9] and the town defendants also cited General Statutes § 52-571c (c).[10]

In response to these motions for summary judgment,

the plaintiff submitted memoranda in opposition in which he claimed, inter alia, that his causes of action were saved through the application of § 52-593a, and he included the affidavit of Griffin, who attested in relevant part that "process to be served [in this] case was delivered to [him] on May 20, 2010." In response, in February, 2014, the town defendants and the hospital defendants filed motions to strike Griffin's affidavit on the ground that it was not based on personal knowledge. In particular, they claimed that Griffin had testified during his deposition that he had no recollection of the specific date upon which he had received process in this case and that he had signed the affidavit because Spinella's office asked him to sign it. The town defendants and the hospital defendants attached copies of Griffin's deposition to their motions to strike.

On March 11, 2014, the plaintiff filed an opposition to the defendants' motions to strike the Griffin affidavit, and he also included an affidavit from Spinella. In an order dated April 21, 2014, the court granted the motions to strike Griffin's affidavit, but, upon the request of the plaintiff, permitted him to submit the affidavit of Spinella.[11] The court also gave the defendants sixty days to depose Spinella regarding the facts and circumstances set forth in his affidavit.

On July 9, 2014, the hospital defendants filed a motion, entitled "Motion to Strike Affidavit of A. Paul Spinella and Supplemental Memorandum in Support of Motion for Summary Judgment." They sought to strike Spinella's affidavit on the grounds that the affidavit was not based on personal knowledge and that it contained hearsay. Among the documents submitted in support of the motion to strike was Spinella's certified deposition.

On July 17, 2014, the town defendants filed a similar supplemental motion for summary judgment and motion to strike, which specifically incorporated the July 9, 2014 motion of the hospital defendants. They also contended that Griffin's failure to endorse on his return of service the date he received process in this case was fatal.[12] See footnote 2 of this opinion. The plaintiff filed an opposition to these motions, attaching Spinella's affidavit and portions of his deposition. The hospital defendants and the town defendants each filed a reply. On September 12, 2014, the court rendered a decision striking in part Spinella's affidavit on the ground that it was not based on personal knowledge because Spinella did not witness, firsthand, the marshal pick up the process.

On September 25, 2014, the medical defendants filed a motion for permission to file a supplemental motion for summary judgment, alleging that, in light of the court's recent rulings on the other defendants' motions to strike, the plaintiff's causes of action against them also were barred by § 52-577.[13] On September 30, 2014, the court granted permission to the medical defendants.

Eight days later, on October 8, 2014, the court, in three separate memoranda of decision, rendered summary judgment on behalf of all defendants. Specifically, the court rendered summary judgment on the ground that the plaintiff had failed to establish that process had been delivered to Griffin prior to the running of the applicable statutes of limitations in this case.[14]

The plaintiff claims that the court improperly struck Spinella's affidavit and that it improperly rendered summary judgment despite the existence of issues of material fact regarding whether process was delivered to Griffin prior to the expiration of the statutes of limitations. We agree that the court improperly rendered judgment on the basis that there was no genuine issue of material fact as to whether Spinella delivered process to Griffin prior to the expiration of the applicable three year statutes of limitations.

"The principles that govern our review of a trial court's ruling on a motion for summary judgment are well established. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . .

"In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact . . . but rather to determine whether any such issues exist. . . . The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . Once the moving party has met its burden [of production] . . . the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . [I]t [is] incumbent [on] the party opposing summary judgment to establish a factual predicate from which it can be determined, as a matter of law, that a genuine issue of material fact exists. . . .

"On appeal, the reviewing court must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . [R]eview of the trial court's decision to grant [a party's] motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Episcopal Church in the Diocese*

*of Connecticut* v. *Gauss*, 302 Conn. 408, 421–22, 28 A.3d 302 (2011), cert. denied,    U.S.   , 132 S. Ct. 2733, 183 L. Ed. 2d 653 (2012).

"Summary judgment is appropriate on statute of limitations grounds when the material facts concerning the statute of limitations [are] not in dispute . . . ." (Internal quotation marks omitted.) *Romprey* v. *Safeco Ins. Co. of America*, 310 Conn. 304, 313, 77 A.3d 726 (2013). "The question of whether a party's claim is barred by the statute of limitations is a question of law, which this court reviews de novo." (Internal quotation marks omitted.) *Targonski* v. *Clebowicz*, 142 Conn. App. 97, 106, 63 A.3d 1001 (2013). "A plaintiff relying upon a saving statute [to defeat a statute of limitations defense] must demonstrate compliance with its provisions." (Internal quotation marks omitted.) *Gianetti* v. *Connecticut Newspapers Publishing Co.*, 136 Conn. App. 67, 74, 44 A.3d 191, cert. denied, 307 Conn. 923, 55 A.3d 567 (2012).

Here, the plaintiff argues that this case is not barred by any statute of limitations because process was given to Griffin timely pursuant to § 52-593a and that the documents available to the court when considering the defendants' motions for summary judgment established, at the very least, a genuine issue of material fact on this topic, which is all he was required to establish.

"Section 52-593a . . . extends the period of time for the serving officer to make the delivery. Process must still be received by the serving officer on time. In other words, the plaintiff must get the process to the serving officer within the period allowed by the statute. . . . All that § 52-593a requires . . . is that the process be personally delivered [to the marshal]. It does not require that the delivery be made by the plaintiff, his attorney, or any particular individual. The person making the delivery has no statutory role to perform respecting the delivery. He is neither required nor permitted to endorse his doings on the return. In addition, the statute does not detail the manner of making delivery. The word deliver includes a handing over for the purpose of taking even though both acts do not occur simultaneously. . . . The fact that the extension statute becomes operative only where the process has been delivered before the running of the statute of limitations, and the fact that the serving officer is required to attest to the date of delivery suggest that the purpose of the statute is to ensure that the process is received on time by the officer." (Footnotes omitted; internal quotation marks omitted.) Id., 73–74. "A plaintiff relying upon a 'saving statute' must demonstrate compliance with its provisions. . . . [If] the plaintiff fail[s] to establish a genuine issue of material fact as to his compliance with the provisions of § 52-593a, the court properly render[s] summary judgment . . . ." (Citation omitted.) Id., 74.

In this case, all parties agree that the defendants were

served on June 9, 2010, and that this date was, at a minimum, one day beyond the applicable statutes of limitations. The question we are called upon to answer in this instance is whether the court properly ruled that the evidence submitted in support of, or in opposition to, the motions for summary judgment failed to demonstrate that there existed a genuine issue of material fact as to whether Griffin received process on May 20, 2010. We conclude that, even without the consideration of Griffin's or Spinella's affidavit, there existed evidence in the form of Spinella's deposition testimony to demonstrate the existence of a genuine issue of material fact as to the date process was delivered to Griffin. Accordingly, we conclude that the court improperly rendered summary judgment on the ground that the plaintiff had failed to demonstrate the existence of such a genuine issue.

During his deposition, which was before the court when it ruled on the various motions for summary judgment, Spinella was question by Attorney Michael R. McPherson, counsel for the hospital defendants, and testified in relevant part as follows:

"Q. Now, I've marked what looks to be your affidavit as defendants' exhibit three. . . . Now, is that your affidavit and your signature?

"A. Looks like it.

"Q. Now, it says in the affidavit that you used Marshal Griffin exclusively for service of process in 2010, is that correct?

"A. To the best of my memory, yes.

"Q. Now, in May of 2010, who had the responsibility at your firm to ensure that the marshal received the process for service?

"A. Bonnie St. Onge, to the best of my memory.

"Q. Now, who is Bonnie St. Onge?

"A. My office manager at that time. . . .

"Q. Does Bonnie St. Onge work for your firm still?

"A. No. . . . She's deceased. . . .

"Q. Now, back in May of 2010, can you describe the typical process at your firm as to how, once a complaint was drafted and a summons filled out, those papers were delivered to the marshal . . . .

"A. Well, it depended on the urgency of it. If it was really urgent, he would be called and asked to personally come and get it so we wouldn't have to wait on the mail.

"Q. And who would make the call typically in May of 2010 to the marshal to come pick it up?

"A. Bonnie.

"Q. Now, was it ever your practice to personally hand the process to the marshal when he came to your office, or did you leave that to Bonnie?

"A. We'd leave it on the end of the counter. But he would come in and talk to the staff; he wouldn't just grab it. And it would be handed over to him.

"Q. When you say you'd leave it on the counter, was that counter like a receptionist's desk?

"A. Yes. When you come in my office, there's a long counter, and it's like a wall with a shelf on it. And at the end of that, that would be for pickup.

"Q. Now, did someone sit at that desk or counter area in your office back in May of 2010?

"A. Yes. There were two—Bonnie's office was right there. And I also had a secretary that sat there.

"Q. And what was the name of your secretary who sat right there in May of 2010?

"A. It would have been Bonnie Kiniry.

"Q. Now, I'm trying to picture this in my mind. I've never been to your office, so I apologize. There is a counter that is right when you walk into your office?

"A. Uh-huh.

"Q. And did Bonnie Kiniry sit right behind that counter?

"A. She [sat] near to it. And Bonnie St. Onge [had] an open door that open[ed] right up on the counter.

"Q. Did you typically keep a written record of when the marshal picked up the process in your cases in 2010?

"A. No.

***

"Q. Now, on defendants' exhibit three, which is your affidavit, paragraph 6 reads: 'The summons and complaint in the matter was personally retrieved from my office by Marshal Griffin on May 20, 2010.' Do you have an independent specific recollection of Marshal Griffin taking delivery of the process in this case?

"A. Well, if you're asking me if I, personally, handed it over to him, I did not. But you have to understand the circumstances that surrounded this. I had an enormously demanding client, and there was a lot of concern about the statute of limitations, and there were some revisions that had been made in the complaint at the last minute. And so we were, you know, very anxious to get it in his hands. And, for that reason, we—I didn't contact him personally. I believe that it was Bonnie St. Onge that I asked to do that. It was put on the end of the counter. And I asked to be told, to confirm that he had picked this up, and there was a confirmation made. And I remember going down there, and the complaint

was never there. So it was further confirmation that it had been picked up. You know, this was special circumstances with this complaint because of the statute and a client, like I said, that was very demanding. So that's why it sticks out in my mind.

"Q. Okay. I just want to break that down a little bit. So you did not hand the process to Marshal Griffin for delivery in this case?

"A. No.

"Q. You did not contact Marshal Griffin personally about picking up process?

"A. I believe that I did talk to him on the phone beforehand.

"Q. Okay.

"A. Because, not only did it have to be picked up, but it was going to be a difficult service. And, in point of fact, after it was picked up, I talked to him again— I talked to him personally. I don't know how many times, about the service itself, you know, confirmed that he had picked it up beforehand, but also to talk about the service because there was an issue about getting personal service here. And so that, you know, was another cause for communication with him.

"Q. So just if I could back up a little bit, did you witness Marshall Griffin pick up the process from your office?

"A. Personally?

"Q. Yes.

"A. No.

"Q. Do you have any written or electronic record indicating that Marshal Griffin took delivery of the process on a date certain?

"A. No, but I had an oral confirmation from my staff.

"Q. And when you say you had oral confirmation from your office staff, who told you that the marshal had picked up the process?

"A. I believe it was Bonnie St. Onge.

"Q. So the basis for your statement that Marshal Griffin picked up the process on May 20, 2010, is what Bonnie St. Onge told you that he did.

"A. Yes. To the best of my memory, it was somebody from my staff. To the best of my memory, it was Bonnie St. Onge. What I remember is just getting the confirmation because it was a concern, and then not seeing the complaint at the end of the counter when I did go down there.

"Q. What is your understanding of when the statute of limitations was going to expire in this case?

"A. I don't know. Sometime shortly after the marshal picked up the writ.

"Q. But you don't know the exact date?

"A. I'd have to review something. It was, you know, a day or so afterwards, shortly afterwards.

"Q. . . . . Do you recall how close the statute of limitations was about to expire in [other] particular cases?

"A. No, but it wasn't the only issue here about the statute expiring. Like I said, I had an enormously demanding client, which had revved up this whole issue. That, and having to revise the complaint at the last minute, those are all extraordinary circumstances that, you know, I can't remember ever dealing with to this extent in any other case that I've had.

"Q. And when you say you had an enormously demanding client, what do you mean?

"A. Well, I'd rather not get into that . . . .

"Q. So, it's your testimony Attorney Spinella that roughly four years later, when you signed this affidavit, you have a specific recollection of what occurred on May 20, 2010?

"A. Because of the client and the case, yes. Everything about the case is pretty clear to me.

"Q. You remember May 20, 2010, precisely?

"A. Well, it isn't so much the date that I know, [it is] that it was directly before the statute was going to expire. And you know, that's why it sticks out in my mind.

"Q. But you attested that Marshal Griffin took delivery of the process on a specific day.

"A. Right.

"Q. And I'm asking you, you didn't hand it to him, you didn't contact him personally, you didn't witness him take it. You were told by your staff member that he had picked it up. And I'd like to know the basis for your affidavit or your statement that it was specifically May 20, 2010.

"A. Yes, I believe that it was the day before the statute was going to expire.

"Q. And you have no record of Marshal Griffin, no written documentary evidence of when Marshal Griffin came?

"A. No. Had I known I was going to be deposed in this case, I would have kept a written record.

"Q. So other than the oral confirmation that you received from Bonnie St. Onge, the basis of that statement is you coming down and seeing the process gone

from the countertop?

"A. That and having it orally confirmed with the marshal after he picked it up that he had indeed picked it up on the date that I said.

"Q. So your testimony is that marshal—you spoke to Marshal Griffin after he picked it up, and he told you that he had picked it up on May 20?

"A. Yes. I got it before the statute expired. And we went on to talk about how he was going to get service.

"Q. Now, you know that Marshal Griffin has been deposed in this case?

"A. I've been told that, yes.

"Q. Marshal Griffin never testified—I took his deposition in February, and Marshal Griffin never testified to any conversation that he had with you in which he confirmed May 20. In fact, I'll represent to you [that] he said the first time he ever heard or saw that date is when he came to your office to sign his affidavit that your office prepared . . . . And it's your testimony that Marshal Griffin spoke to you on the phone in 2010 and confirmed that he took delivery of it on May 20, 2010.

"A. Yes. Did he tell you about all the trouble he had with the service and how that, all by itself, was an occasion for us to talk more than once? And why is it so hard to believe—and you yourself know that there was an issue about the service and what was represented at the hospital. Why is it so hard to believe that he talked to me about that, and, in the course of that, there was a confirmation that he did indeed pick up the complaint as I just said? I mean, it's only natural to talk about that. In addition to that—

"Q. Attorney Spinella, I'm not asking you whether it's difficult to believe that you would speak to Marshal Griffin at all. I'm asking you that—Marshall Griffin—no, he did not tell me about the difficulties he had with service.

"A. There you go. . . .

"Q. So putting aside the conversations that you had with Marshal Griffin about the difficulties of service, I'm talking specifically the day on which he took delivery. Why would the day on which he took delivery be a subject of conversation with you during those time frames? How would that have any relationship to the difficulty of serving someone in hand or abode or with their office manager?

"A. Because it was the day before the statute expired. It comes in a package. Here's a gentleman that's concerned about doing a proper service. First issue is to confirm that he got this before the statute expired, which he confirmed. Then we went on to the next natural topic of conversation—the difficulty posed by your

clients in getting personal service. So we talked about both these things. It's only natural."

In deciding a motion for summary judgment, "[i]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Internal quotation marks omitted.) *Byrne* v. *Burke*, 112 Conn. App. 262, 268, 962 A.2d 825, cert. denied, 290 Conn. 923, 966 A.2d 235 (2009).

In the present case, even if we assume without deciding that the court properly struck Spinella's affidavit, the court had before it his deposition testimony, which sufficiently raises a genuine issue of material fact as to whether Griffin received process on May 20, 2010. Spinella testified that when there was an urgency in the time for delivery of process to the marshal, he or someone in his office would telephone the marshal and ask him to pick up the process at their office. He also testified that in 2010, he exclusively used Griffin for service of process. He stated that the practice of the office was to leave the process at the end of the counter, where it readily could be given to the marshal when he arrived to pick it up. Spinella also testified that on May 20, 2010, process was left for Griffin, and that, later, the complaint was no longer on the counter, thereby confirming for him that it had been picked up. We conclude that this in and of itself was enough to create a reasonable inference, if believed, that Griffin picked up process at Spinella's office on May 20, 2010. Spinella also stated that his staff gave him oral confirmation that Griffin had picked up the process.[15]

But, in addition to this testimony, Spinella also testified that his memory surrounding these events was very clear because they were so close to the running of the statutes of limitations for the plaintiff's causes of action that he was paying close attention to the dates and to making sure that process was delivered to Griffin timely. Spinella testified that, the day after Griffin picked up the process, he telephoned Griffin to go over some possible problems that might be encountered with service in this case, and that Griffin confirmed, during that phone conversation, that he had picked up the process the day before, on May 20, 2010. See footnote 15 of this opinion. This testimony, if believed, establishes that process was delivered to Griffin on May 20, 2010, before the running of the statute of limitations.

A review of the evidence submitted either in support of or in opposition to the defendants' motions for summary judgment demonstrates the existence of a genuine issue of material fact as to whether process was delivered to Griffin on May 20, 2010, thereby saving the plaintiff's causes of action through the application of § 52-593a. Accordingly, the court improperly rendered

summary judgment on this ground.

## II

The town defendants raise in their brief as an alternate ground for affirmance a claim that "under the circumstances of this case, the plaintiff's failure to comply with § 52-593a (b) is fatal." They argue that "where a marshal's return is silent as to the date of delivery of process, there is a fatal failure to comply with the requirement of § 52-593a (b), and the saving statute is unavailable." (Internal quotation marks omitted.) We disagree.

The proper interpretation of § 52-593a (b) is a question of statutory construction over which our review is plenary. See *Dorry* v. *Garden*, 313 Conn. 516, 525, 98 A.3d 55 (2014). "That review is guided by well established principles of statutory interpretation . . . . As with all issues of statutory interpretation, we look first to the language of the statute. . . . In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended. . . . Furthermore, [i]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Citations omitted; internal quotation marks omitted.) Id.

Section 52-593a (b) provides: "In any such case, the officer making service shall endorse under oath on such officer's return the date of delivery of the process to such officer for service in accordance with this section." In interpreting the language of § 52-593a (b), however, we do not write on a clean slate, but are bound by our previous judicial interpretations of the language and the purpose of the statute. See *Dorry* v. *Garden*, supra, 313 Conn. 526.

In *Dickerson* v. *Pincus*, 154 Conn. App. 146, 153–55, 105 A.3d 338 (2014), we discussed whether § 52-593a was mandatory or directory, and we concluded that it was directory. "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially where the requirement is stated in affirmative terms unaccompanied by negative words. . . .

"The essence of the thing to be accomplished in § 52-593a is to allow an action to be brought even though process is served after the expiration of the limitations period, when process is delivered to the marshal within

the limitations period and the marshal serves process within thirty days of delivery. [Section] 52-593a is a remedial provision that allows the salvage of an [action] that otherwise may be lost due to the passage of time. . . . [R]emedial statutes must be afforded a liberal construction in favor of those whom the legislature intended to benefit. . . . Our preference is to avoid a termination of proceedings due to mere technical imperfection." (Citations omitted; internal quotation marks omitted.) Id., 153–54.

Specifically as to subsection (b) of § 52-593a, we opined: "[S]ubsection (b) of § 52-593a does not address the essence of the thing to be done, which . . . [is] delivery to the marshal within the period of limitations; rather, it provides the manner in which compliance with subsection (a) of § 52-593a is supposed to be shown." Id., 154.[16] "The marshal's failure to comply with the requirements of subsection (b) of § 52-593a does not preclude the application of the savings statute . . . . [T]he provisions of subsection (b) are directory rather than mandatory, and the failure of the marshal to include the date of delivery in the return is not a fatal jurisdictional defect depriving the plaintiff of his day in court." Id., 153.

Because this court already has concluded that § 52-593a (b) is directory, rather than mandatory, and that the failure of the marshal to include the date on the return is not a fatal defect, this claim merits no further discussion. "It is axiomatic that [a] decision of [an appellate court] is a controlling precedent until overruled or qualified. . . . [S]tare decisis . . . serve[s] the cause of stability and certainty in the law—a condition indispensable to any well-ordered system of jurisprudence . . . ." (Internal quotation marks omitted.) *State* v. *Jahsim T.*, 165 Conn. App. 534, 545, 139 A.3d 816 (2016); see also see also *Burns* v. *Adler*, 158 Conn. App. 766, 792, 120 A.3d 555 (previous decision of Appellate Court binding "until it is overruled either by our Supreme Court or by an en banc panel of this court"), cert. granted on other grounds, 319 Conn. 931, 125 A.3d 205, 206 (2015).

### III

The plaintiff next claims that trial court improperly denied his motion to disqualify Judge Sheridan. He argues that he had two grounds on which he sought to disqualify the judge. First, he claims that Judge Sheridan's statements before the Judiciary Committee[17] during his confirmation hearing to become a judge of the Superior Court demonstrated a bias in favor of police officers. Second, he claims that when Judge Sheridan was the town attorney for the town of Manchester for approximately five months during 2010, Attorney Scott M. Karsten, who is one of the attorneys on the defendants' side in the present case, represented Manchester in a case involving, inter alia, Manchester police offi-

cers, thus creating a relationship that could be characterized as that of "attorney-client under the Rules of Professional Conduct," or as that of master-servant. The plaintiff claims that his motion should have been granted because Judge Sheridan was disqualified from further action in this case on the basis of Canon 2 of the Code of Judicial Conduct, Rule 2.11.[18] The defendants argue that this claim was waived because the plaintiff did not file his motion for disqualification until October 28, 2014, twenty days after the motions for summary judgment were granted on October 8, 2014, and, in the alternative, that the court properly denied the motion because there neither was evidence of bias nor of an attorney-client or master-servant relationship between Judge Sheridan and Attorney Karsten. We conclude that the court properly denied the plaintiff's motion to disqualify Judge Sheridan.

"A trial court's ruling on a motion for disqualification is reviewed for abuse of discretion. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . .

"Pursuant to our rules of practice; see Practice Book § 1-22; a judge should disqualify himself from acting in a matter if it is required by rule 2.11 of the Code of Judicial Conduct, which provides in relevant part that [a] judge shall disqualify himself . . . in any proceeding in which the judge's impartiality might reasonably be questioned . . . . In applying this rule, [t]he reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . . Moreover, it is well established that [e]ven in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority. . . . Nevertheless, because the law presumes that duly elected or appointed judges, consistent with their oaths of office, will perform their duties impartially . . . and that they are able to put aside personal impressions regarding a party . . . the burden rests with the party urging disqualification to show that it is warranted." (Citations omitted; internal quotation marks omitted.) *Stefanoni* v. *Darien Little League, Inc.*, 160 Conn. App. 457, 464–65, 124 A.3d 999 (2015).

After a hearing before the court, *Dubay, J.*, on the plaintiff's motion to disqualify Judge Sheridan, Judge Dubay specifically ruled: "The motion is denied for the following reasons, inter alia:

"1. The 'pull quote' of Judge Sheridan's testimony

before the Judiciary Committee, upon which the plaintiff's first ground for requesting relief entirely relies, is not, in fact, a fair characterization of Judge Sheridan's testimony regarding perjury in general and police officers as witnesses in particular.

"2. Further, the basis of Judge Sheridan's order granting summary judgment did not in any way involve the testimony of police officers.

"3. The second ground advanced by the plaintiff in support of his motion, that, at some time in the past, there was a four or five month cocounsel relationship between Judge Sheridan and Attorney Karsten [that] mandates recusal, has no basis in fact. Counsel for the plaintiff conceded at argument that there is no evidence to support his claims in that regard, and, rather, he 'assumed' the allegations in his certificate of good faith dated October 28, 2014."

After reviewing the record, including the plaintiff's motion and its attachments, as well as the transcript of the hearing before Judge Dubay, we agree with Judge Dubay that the quoted language relied on by the plaintiff of Judge Sheridan's testimony before the Judiciary Committee is not an accurate representation of Judge Sheridan's full answer regarding the truthfulness of police officers when they are testifying under oath. See footnote 17 of this opinion. We conclude, therefore, that the plaintiff failed to show that Judge Sheridan's testimony demonstrated bias in favor of police.

Additionally, we agree with Judge Dubay that the plaintiff's attorney conceded during the hearing on the plaintiff's motion that he merely had "assumed" the allegations in his certificate of good faith that there had been an attorney-client or a master-servant relationship between Attorney Karsten and Judge Sheridan for an approximate five month period during 2010.[19] Indeed, there simply is no evidence to support this assumption. Accordingly, we conclude that the court properly denied the plaintiff's motion to disqualify Judge Sheridan.

The judgment is affirmed as to the plaintiff's motion for disqualification; the summary judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

[1] The plaintiff was granted permission to proceed under a pseudonym due to the nature of the allegations in the complaint.

[2] General Statutes § 52-593a provides: "(a) Except in the case of an appeal from an administrative agency governed by section 4-183, a cause or right of action shall not be lost because of the passage of the time limited by law within which the action may be brought, if the process to be served is personally delivered to a state marshal, constable or other proper officer within such time and the process is served, as provided by law, within thirty days of the delivery.

"(b) In any such case, the officer making service shall endorse under oath on such officer's return the date of delivery of the process to such officer for service in accordance with this section."

In this particular case, a critical problem is presented because the marshal's return is silent as to when service of process was received from the plaintiff, and, thus, it fails to comply with the provisions set forth in § 52-593a (b). See also General Statutes § 6-32 (a) ("Each state marshal shall receive each process directed to such marshal when tendered, execute it promptly and make true return thereof; and shall, without any fee, give receipts when demanded for all civil process delivered to such marshal to be served, specifying the names of the parties, the date of the writ, the time of delivery and the sum or thing in demand. If any state marshal does not duly and promptly execute and return any such process or makes a false or illegal return thereof, such marshal shall be liable to pay double the amount of all damages to the party aggrieved.")

[3] In his complaint, the plaintiff also had named Sergeant Jeffrey Rose as a defendant (in both his official and individual capacity) and Mary Commisso, a psychologist. Both Rose and Commisso, however, were removed as defendants prior to the rendering of summary judgment and are not parties to this appeal.

Each collective group of defendants, namely, the town defendants, the medical defendants, and the hospital defendants, separately are represented by their own attorneys. On appeal, the town defendants and the hospital defendants have joined in and adopted the portions of the medical defendants' appellate brief specifically addressed to the issues raised by the plaintiff.

[4] The town defendants raise in their brief as an alternate ground for affirmance a claim that the failure to comply with § 52-593a (b) is fatal in this case. Although this claim was not contained in the town defendants' preliminary statement of the issues and alternate grounds for affirmance, the plaintiff has addressed this claim in his reply brief. Because this matter presents a pure issue of law, we will consider this claim in part II of this opinion. The remaining defendants filed preliminary statements of the issues with multiple alternate grounds for affirmance, which they briefed. The plaintiff, although addressing these alternate grounds in his reply brief, argues, nonetheless, that these alternate grounds should not be reviewed for the first time on appeal. We agree with the plaintiff and decline to exercise our discretion to address the additional alternate grounds on appeal. See *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 219, 928 A.2d 586 (2007) (when trial court has not ruled on all grounds raised in motion for summary judgment, Appellate Court has discretion to consider alternate grounds for affirmance), aff'd, 289 Conn. 57, 956 A.2d 579 (2008); see also *Skuzinski* v. *Bouchard Fuels*, *Inc.*, 240 Conn. 694, 703, 694 A.2d 788 (1997) (when trial court does not rule on merits of alternate grounds, we retain discretion to consider those grounds on appeal).

[5] The plaintiff also claimed that the court abused its discretion in denying his motion for reargument on the basis of newly discovered evidence related to the timeliness of the delivery of process to the marshal. Because we agree with the plaintiff's first claim and reverse the judgment granting the defendants' motions for summary judgment, his second claim, regarding the court's denial of his motion to reargue his opposition to those motions, need not be considered.

[6] We note that the medical defendants and the hospital defendants have filed neither an answer to the plaintiff's complaint nor specially pleaded a statute of limitations defense in this case. See Practice Book § 10-50 ("No facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. Thus . . . *the statute of limitations . . . must be specially pleaded* . . . ." [Emphasis added.]) The plaintiff has not raised this as an issue in this case. Accordingly, we do not consider its import, if any.

[7] The plaintiff also filed a six page motion for articulation, requesting that Judge Sheridan further articulate the basis of his granting the defendants' motions for summary judgment, as well as the denial of the plaintiff's motion for reargument. Judge Sheridan issued an articulation in response.

[8] General Statutes § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

[9] General Statutes § 52-584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician,

surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

The hospital defendants contended that a two year statute of limitations, pursuant to § 52-584, was applicable to count forty-three of the plaintiff's complaint, in which the plaintiff had alleged a violation of the patient's bill of rights pursuant to General Statutes § 17a-540 et seq. The plaintiff argued that the three year statute of limitations pursuant to § 52-577 applied to this count. For purposes of the summary judgment motion, the court assumed, without deciding, that the three year statute of limitations was applicable. For purposes of this appeal, we do the same.

[10] General Statutes § 52-571c provides: "(a) Any person injured in person or property as a result of an act that constitutes a violation of section 53a-181j, 53a-181k or 53a-181*l* may bring a civil action against the person who committed such act to recover damages for such injury.

"(b) In any civil action brought under this section in which the plaintiff prevails, the court shall award treble damages and may, in its discretion, award equitable relief and a reasonable attorney's fee.

"(c) No action shall be brought under this section but within three years from the date of the act complained of."

[11] Spinella's affidavit provided:

"1. My name is Paul Spinella and I am over the age of eighteen. I know and understand the importance of an oath. I made the following statements under oath.

"2. I represented the [p]laintiff in this matter at the time the lawsuit was initially filed.

"3. I was acutely aware of the statute of limitations in this matter.

"4. On May 19, 2010, I executed the summons with attached complaint, initiating this lawsuit.

"5. My law office used the services of [S]tate Marshal John Griffin exclusively for all service of processes. Our practice was for him [to] come to pick up all documents for service at my office.

"6. The summons and complaint in this matter was personally retrieved from my office by Marshal Griffin on May 20, 2010."

[12] The trial court did not decide this issue.

[13] The medical defendants had filed their original motion for summary judgment on August 8, 2013, on various grounds not including the running of the statute of limitations.

[14] It does not appear that the plaintiff had an opportunity to respond to the medical defendants' supplemental motion for summary judgment before the court rendered judgment.

[15] Although this may be considered inadmissible hearsay (barring any exception), it was the defendants who submitted Spinella's deposition and no objection was made on hearsay grounds.

[16] "A comparison between the facts of this case and those of *Gianetti* v. *Connecticut Newspapers Publishing Co.*, [supra] 136 Conn. App. 67 . . . is instructive. In *Gianetti*, there was no evidence that the marshal had received the process within the prescribed period; id., 72; in those circumstances, the failure of the marshal to include the date of delivery in the return of process was fatal. Id., 74. This court mentioned the duty of the marshal to comply with the requirements of § 52-593a (b) and that the plaintiff had not shown the marshal's compliance with subsection (b). Id., 72. The court went on, however, to discuss in some detail whether proof of mailing the process to the marshal constituted delivery for the purpose of the saving statute. Id., 73. Such discussion would have been entirely immaterial had the only dispositive question been the marshal's compliance with § 52-593a (b). The court in *Gianetti* further noted that because no amended return or affidavit had been filed, it did not have to decide whether an amended return or affidavit would have sufficed to cure the defect. Id., 74." *Dickerson* v. *Pincus*, supra, 154 Conn. App. 155 n.8.

[17] The plaintiff contends that "Judge Sheridan should have disqualified himself because his statement before the legislature that 'I don't believe police officers perjure themselves' would cause an objective observer to

reasonably question Judge Sheridan's impartiality." A review of the Judiciary Committee's public hearing on the confirmation of Judge Sheridan reveals the following relevant colloquy:

"Rep. [Minnie] Gonzalez: Okay. . . . When you have a case, and, let's say the police officers that are involved—police officers are involved and they were to testify. Do you believe—do you always believe that police officers, and prosecutors also, they all tell the truth to the judge? Do you really believe that?

"David M. Sheridan: I don't believe police officers perjure themselves. I just—if it happens, I would imagine it's exceedingly rare, but I think police officers, I believe, you know, [I have been] examining witnesses in the courts of this state for twenty-five years, and witnesses can get up there and testify, and they truly believe they're telling the truth. They truly believe they're being honest under oath, but what they're saying is not true, the absolute truth, and I believe police officers are subject to all of the frailties of human beings that we—regular lay witnesses testify incorrectly . . . . We ask that routinely to jurors when we panel jurors. You know, a police officer is going to testify in this case, would you be more inclined to believe the testimony of a police officer and, you know, I could probably count [on] one hand the times that people have said they would believe a police officer no matter what. . . . So I think most people have that concept of, you know, there's not reason to necessarily believe a police officer. His testimony has to still stack up and still add up. It has to still make sense." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 15, 2010 Sess., pp. 4769–70.

[18] Canon 2 of the Code of Judicial Conduct, Rule 2.11 provides:

"(a) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned including, but not limited to, the following circumstances:

"(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.

"(2) The judge knows that the judge, the judge's spouse or domestic partner, or a person within the third degree of relationship to either of them, or the spouse or domestic partner of such a person is:

"(A) a party to the proceeding, or an officer, director, general partner, managing member, or trustee of a party;

"(B) acting as a lawyer in the proceeding;

"(C) a person who has more than a de minimis interest that could be substantially affected by the proceeding; or

"(D) likely to be a material witness in the proceeding.

"(3) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, domestic partner, parent, or child, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding.

"(4) The judge has made a public statement, other than in a court proceeding, judicial decision, or opinion that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy.

"(5) The judge:

"(A) served as a lawyer in the matter in controversy or was associated with a lawyer who participated substantially as a lawyer in the matter during such association;

"(B) served in governmental employment and in such capacity participated personally and substantially as a lawyer or public official concerning the proceeding or has publicly expressed in such capacity an opinion concerning the merits of the particular matter in controversy; or

"(C) was a material witness concerning the matter.

"(b) A judge shall keep informed about the judge's personal and fiduciary economic interests and make a reasonable effort to keep informed about the personal economic interests of the judge's spouse or domestic partner and minor children residing in the judge's household.

"(c) A judge subject to disqualification under this Rule, other than for bias or prejudice under subsection (a) (1), may ask the parties and their lawyers to consider, outside the presence of the judge and court personnel, whether to waive disqualification, provided that the judge shall disclose on the record the basis of such disqualification. If, following the disclosure, the parties and lawyers agree, either in writing or on the record before another judge, that the judge should not be disqualified, the judge may participate in the proceeding.

"(d) Notwithstanding the foregoing, a judge may contribute to a client security fund maintained under the auspices of the court, and such contribu-

tion will not require that the judge disqualify himself or herself from service on such a client security fund committee or from participation in a lawyer disciplinary proceeding or in any matter concerning restitution or subrogation relating to such a client security fund.

"(e) A judge is not automatically disqualified from sitting on a proceeding merely because a lawyer or party to the proceeding has filed a lawsuit against the judge or filed a complaint against the judge with the judicial review council. When the judge becomes aware that such a lawsuit or complaint has been filed against him or her, the judge shall, on the record, disclose that fact to the lawyers and parties to the proceeding before such judge and shall thereafter proceed in accordance with Practice Book Section 1-22 (b).

"(f) The fact that the judge was represented or defended by the attorney general in a lawsuit that arises out of the judge's judicial duties shall not be the sole basis for recusal by the judge in lawsuits where the attorney general appears."

[19] The plaintiff's attorney specifically told the court during the hearing on the plaintiff's motion to disqualify Judge Sheridan: "I drafted the motion based on what I read the [Manchester] town code to be and what I assumed Judge Sheridan and Attorney Karsten's relationship would have been had the town code been followed. I did not know [the Connecticut Interlocal Risk Management Agency (CIRMA)] was involved in that. I don't think I could have done a bill of discovery or any discovery on this matter at that point. So, I had to—once I had the fact in my hand that Attorney Karsten represented . . . Manchester and then Attorney Sheridan was the town attorney for Manchester, those are the inferences that I had to draw based on the town code . . . . I'll acknowledge that I have since been disabused of certain of those notions by Attorney Karsten's affidavit, but I don't for a moment think that it was wrong to draft the motion the way in which I did."

Attorney Karsten's affidavit provided in relevant part:

"5. . . . I was counsel for several defendant Manchester police officers and the [t]own of Manchester in certain litigation [by a plaintiff known as Morales] . . . . I represented these defendants through the conclusion of the action in June, 2012.

"6. I was selected and retained for this representation exclusively by CIRMA . . . which was and is the municipal insurance company for many cities and towns in Connecticut, including Manchester.

"7. Throughout the period of my involvement in the Morales case, I and my law firm submitted all invoices for legal services rendered directly to CIRMA, which duly approved and paid them. . . .

"10. Based on my thirty plus years of experience in representing municipal entities in cases such as Morales, it is entirely customary for insurance defense counsel to exclusively handle the litigation of which they are retained, with minimal or no involvement of a town attorney absent a conflict of some unusual development.

"11. During the five months of [then Attorney] Sheridan's service as Manchester Town Attorney, I believe I had no interactions with him whatsoever—not in person, on the phone, via e-mail, or other correspondence—regarding the Morales case or any other matter.

"12. At no time did Town Attorney Sheridan ever direct, review, approve, or, in any way, supervise my work on behalf of the Manchester defendants in the Morales case . . . .

"14. There is no factual basis whatsoever for the claims to the contrary set forth in [the] [p]laintiff's [m]otion."

---